UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-345 (NEB/JFD)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | **TRIAL BRIEF OF THE UNITED STATES OF AMERICA** |
| MUSE MOHAMUD MOHAMED, | |
| Defendant. | |

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Kimberly A. Svendsen and Angela M. Munoz, Assistant United States Attorneys, submits its trial brief in this matter. This memorandum includes a summary of the facts the government expects the evidence to establish at trial along with briefing addressing the government's motions in limine and other potential evidentiary matters.

**I.      Summary of the Evidence at Trial**

The United States anticipates the evidence at trial will prove the following facts:

    **A.      The August 11, 2020 Primary Election**

The State of Minnesota held a primary election on August 11, 2020. The ballot contained a number of party candidates for various local, state, and federal offices. Within certain wards and precincts of the City of Minneapolis, the ballot also contained primary candidates for the Minnesota State Senate.

On June 26, 2020, absentee ballots were mailed out to any voter who had already requested an absentee ballot and voters were also permitted to begin early voting in person. The City of Minneapolis recommended that anyone applying for an absentee ballot do so at least fourteen days before the election date. This time frame would give a voter enough time to receive a ballot and return the ballot prior to the election. The last day to return an absentee ballot for the primary was August 11, 2020; the same day as the election.

In conjunction with absentee voting, voters in the August 2020 election were allowed to vote using a system called "Agent Delivery." In general, agent delivery of absentee ballots is a process that is intended to address a situation where a voter intends to vote in person at a polling place, but then after it is too late to obtain an absentee ballot and vote by mail, the voter is unexpectedly unable to vote in person.

Pursuant to Minnesota state law, voters with "incapacitating health reasons" or disabilities may apply for agent delivery of their absentee ballot. To vote absentee via agent delivery, the voter may select an agent to act on his or her behalf. The agent must be at least 18 years old, have a pre-existing relationship with the voter, and cannot be a candidate in the election. Upon selecting an agent, the voter must fill out (1) an application requesting an absentee ballot and (2) a request for agent delivery of absentee ballot form. The agent then takes both documents to the election office where election officials can release the voter's absentee ballot to the agent. The agent must then deliver the absentee ballot to the voter, the voter then votes and seals the absentee ballot in an envelope, and thereafter the agent returns the absentee ballot to the election office on the voter's behalf.

Importantly, as part of the agent delivery process, as with any other method of voting, the voter must vote his or her own ballot. The agent delivery process does not permit anyone to vote a ballot without the voter's knowledge or to circumvent the "one person, one vote" principal that underlies the democratic process.

A single agent may pick up absentee ballots for three voters during any given election. Agents are required to provide election officials with identification and log each ballot that they deliver through this process. The Minneapolis Office of Elections and Voting maintained records of the agent delivery logs for agents who delivered absentee ballots during the August 11, 2020 primary election.

**B. Muse Mohamed's Grand Jury Testimony**

In conjunction with an investigation into the use of the agent delivery process during the August 11, 2020 primary election, Defendant Muse Mohamed was served with a subpoena to provide testimony before a grand jury seated in the District of Minnesota. The City of Minneapolis' election records document that Mohamed delivered three ballots as an agent for three voters during the August 11, 2020 primary election. The three voters, however, do not know Mohamed and did not ask him to pick up and deliver absentee ballots for them. One of the ballots that Mohamed attempted to return to the City of Minneapolis was ultimately rejected because the voter had voted in person at her polling place.

Mohamed appeared before the grand jury on both September 30, 2021 and October 14, 2021. During both appearances, Mohamed was asked about the three ballots that he purportedly picked up at the request of three voters, delivered to the three voters, had the voters vote the ballots, and then returned the ballots to election officials. On October 14,

2021 alone, Mohamed was asked dozens of times how and from whom he obtained the absentee ballots for the three voters. Many of Mohamed's answers to the questions were simply nonresponsive. He gave long and detailed explanations for the process and procedures by which a non-specific voter could obtain an absentee ballot.

Ultimately, Mohamed stated he received the three absentee ballots from the voters themselves. When confronted with the fact that the voters each gave statements that they do not know Mohamed and that they did not ask him or anyone for agent delivery of their ballots for the August 2020 election, Mohamed continued to stand by his answer that he received the ballots from the voters.

## II. United States' Motions in Limine

### A. Motion for Admission of the Transcript of Muse Mohamed's September 30, 2021 Grand Jury Testimony

The government intends to offer evidence that two weeks prior to the grand jury testimony containing the false statements with which Mohamed is charged in this case, he testified before the grand jury on September 30, 2021 and made similar false statements. For example, Mohamed testified that he acted as an agent in the agent delivery process during the August 2020 primary season at the request of voters, that he went to voters' homes either because he was sent there by a campaign or because he spontaneously found voters who happened to need assistance with the delivery of their ballot, and that he interacted with the three voters for whom he ultimately acted as an agent.

Mohamed's grand jury testimony on September 30, 2021 is admissible as a non-hearsay statement of a party opponent. Rule 801(d)(2)(A) provides that an out-of-court

statement made by an opposing party and offered against that party is not hearsay. *See United States v. Frost*, 234 F.3d 1023, 1025 (8th Cir. 2000) (reversing district court's refusal to admit in criminal fraud case portions of defendant's deposition from related civil proceeding); *United States v. Lay*, 612 F.3d 440, 448 (6th Cir. 2010) (defendant's "deposition testimony from a previous case was admissible non-hearsay because it [was] an admission by a party-opponent") (citing Fed. R. Evid. 801(d)(2)).

Additionally, this evidence is admissible because it provides direct evidence of Mohamed's knowledge that his grand jury testimony two weeks later, on October 14, 2021, was false. Out of an abundance of caution, the government has provided notice to the defendant as to this evidence under Federal Rule of Evidence 404(b). However, the government does not believe this is other bad acts evidence governed by Rule 404(b), but rather this evidence is res gestae, and it is therefore admissible to show the full context of the crime charged. Rule 404(b) does not apply to acts which are "inextricably intertwined" with the charged crime. *United States v. Aldridge*, 561 F.3d 759, 766 (8th Cir. 2009).

Res gestae is "evidence of wrongful conduct other than the conduct at issue . . . offered for the purpose of providing the context in which the charged crime occurred." *United States v. Campbell*, 764 F.3d 880, 888 (8th Cir. 2014) (internal quotation marks omitted). Such evidence is admitted to "complete the story or provide a total picture of the charged crime." *Id.* Unlike Rule 404(b), pertaining to distinct prior acts, res gestae relates to crimes that are "so blended or connected with the ones on trial that proof of one incidentally involves the others." *Id.* (internal quotation marks omitted). Mohamed's false statements to the grand jury on September 30, 2021 regarding the same topics about which

he lied to the grand jury two weeks later in his charged October 14, 2021 testimony is direct evidence—res gestae—of his knowledge that his testimony was false.

Even if Mohamed's September 30, 2021 grand jury testimony were considered Rule 404(b) evidence, the evidence is clearly admissible. The Eighth Circuit has repeatedly indicated that it regards Federal Rule of Evidence 404(b) as a rule of inclusion, "precluding only evidence that is relevant solely to the defendant's character." *United States v. Jones*, 990 F.2d 1047, 1050 (8th Cir. 1993), *cert. denied*, 510 U.S. 1048 (1994). This kind of evidence is admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Further, where knowledge is an element of the crimes charged, evidence of other acts tending to establish that element is generally admissible. *United States v. Halk*, 634 F.3d 482, 487 (8th Cir. 2011). Evidence of other crimes, wrongs, or acts is therefore admissible under Rule 404(b) if it is (1) relevant to a material issue, (2) proved by a preponderance of the evidence, (3) higher in probative value than prejudicial effect, and (4) similar in kind and close in time to the crime charged. *Id.* Here, all four elements for admissibility are satisfied.

        **1.**    **The evidence is relevant to a material issue.**

For each count of the Indictment, the government must prove that Mohamed gave testimony to the grand jury that he knew was false. The government will present substantial evidence that Mohamed knew his statements that he interacted with voters and was asked by the voters to serve as their agent in the agent delivery process were false, but to the extent Mohamed were to argue that his false statements were the result of a

6

misunderstanding or a mistake, it is particularly compelling evidence that Mohamed gave similar false testimony to the grand jury two weeks earlier. Because Mohamed was given a second opportunity to return to the grand jury and correct his false testimony but chose not to do so, he was clearly aware and determined to make the false statements to the grand jury on October 14, 2021, the date of the charged testimony. This evidence is thus highly relevant to the issue of knowledge and absence of mistake.

**2.      The evidence is proved by a preponderance of the evidence.**

The evidence of Mohamed's testimony before the grand jury on September 30, 2021 will be easily proven because the testimony was transcribed by a court reporter and translated by a certified Somali interpreter. As set forth below, the government anticipates either obtaining a stipulation regarding the accuracy of Mohamed's grand jury transcripts or calling the court reporters and/or the Somali interpreter as witnesses during the trial. Accordingly, the evidence will be proved by a preponderance of the evidence.

**3.      The evidence is more probative than prejudicial, and the evidence is similar in kind and close in time.**

As set forth above, Mohamed's first round of false testimony before the grand jury took place on September 30, 2021—two weeks before the false testimony charged in the Indictment. It demonstrates that Mohamed was well aware of the questions the government intended to ask him, the information the government needed for its investigation, and his duty to testify truthfully because he was under oath. Mohamed simply made a decision not to do so. This evidence shows Mohamed acted with intent and knowledge, and without

mistake or accident when he gave false testimony to the grand jury on October 14, 2021. This evidence is highly probative.

Under the test for admissibility of Rule 404(b) evidence, the question is not whether the evidence is prejudicial, but rather whether it is *unduly prejudicial* in light of its probative value. "Rule 403 is concerned only with 'unfair prejudice,' that is 'an undue tendency to suggest decision on an improper basis.'" *United States v. Yellow*, 18 F.3d 1438, 1442 (8th Cir. 1994) (quoting Fed. R. Evid. 404(b) Advisory Committee's note). As a general matter, any relevant evidence offered by the government is prejudicial—indeed, by definition, evidence that tends to show the defendant's guilt is prejudicial. In contrast, if the evidence being offered was unrelated to the charged offense and was intrinsically inflammatory (such as a murder, rape or child pornography offense), the evidence would likely be unduly prejudicial. In this case, the Rule 404(b) evidence is highly probative on the issues of knowledge, intent, and absence of mistake or accident. Accordingly, the probative value of the evidence substantially outweighs its prejudicial nature.

**B.    Motion to Preclude Evidence Characterizing the FBI's Relationship with the Somali Community**

The United States has moved in limine for an order precluding the defendant or his counsel, in the presence of the jury, from introducing at trial (through testimony or argument) reference to their opinions about the FBI's treatment of the Somali community generally, allegations that the investigation underlying this matter targeted the Somali community, and other generalized references to local and national FBI investigations and/or treatment of Muslims. At this time, the Defendant has notified the United States

that it intends to call one witness to provide testimony regarding this subject matter. The United States moves to preclude the Defendant from calling this witness, and to preclude the Defendant himself or his attorney from providing testimony or argument on this subject matter.[1]

As a preliminary matter, such evidence would be irrelevant to the sole question with which the jury is charged: whether Muse Mohamed knowingly made false declarations before a grand jury. Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.") According to the discovery disclosure provided by the defense, the witness would provide generalized testimony regarding subjects that have no bearing on the four elements of the crime of making a false declaration before a grand jury. For example, the witness identified by the defense does not have direct knowledge of the proceedings in the grand jury when the Defendant testified, the grand jury's underlying investigation, or any knowledge of the Defendant's purported involvement in the August 2020 primary election. Instead, the witness appears to be noticed to provide generalized testimony about his personal opinions and personal beliefs regarding past investigations by the FBI.[2]

---

[1] The government will make the report regarding the proffered witness' testimony available for the Court's review upon request at the pretrial conference.

[2] To the extent the defendant intends to offer this evidence as some type of expert testimony regarding the relationship between the FBI and the Somali community, the Court should preclude him from doing so, as the proffered testimony is neither relevant nor reliable. *See Daubert v. Merrell Down Pharms., Inc.*, 509 U.S. 579, 589 (1993) (trial court must ensure that any and all . . . testimony or evidence admitted is not only relevant, but reliable). Moreover, an expert opinion must be tied to the facts in the case; broad generalities unmoored from case-specific facts do not suffice. *United States v. Purkey*, 428 F.3d 738, 752-53 (8th Cir. 2005). Finally, the defendant failed to make an appropriate expert disclosure by the Court's April 5, 2022 deadline.

Given the lack of relevance to the issues before the factfinder, testimony and argument characterizing the FBI's relationship with the Somali community can only be construed as calculated to induce jury nullification. In other words, the purpose of such evidence would be to influence the jury to acquit the defendant even if they find that he knowingly made false statements to the grand jury. Such evidence and arguments are irrelevant, improper, and highly prejudicial. *See United States v. Mayer*, No. 19-cr-0096-WMW/HB, 2021 WL 2434121, at *5 (D. Minn. June 15, 2021) (citing cases). While the United States does not anticipate any explicit attempts to invite jury nullification, certain lines of argument and evidence may also have that effect and should be prohibited. *See United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975) (affirming district court's refusal to admit evidence bearing no legal relation to the charges but that might invite a "'conscience verdict'" of acquittal, and noting that nullification "undermines the very basis of our system"), *supplemented by* 536 F.2d 410 (D.C. Cir. 1976); *see also United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) (explaining that "the power of juries to 'nullify'" is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent").

The Defendant should be precluded from arguing that he should not be held accountable for his false statements to the grand jury based on a lay witness's generalized characterizations and opinions about law enforcement's investigations concerning and interaction with the Somali and Muslim communities. This argument suggests to the jury that it should acquit notwithstanding the defendant's decision to provide false statements to the grand jury. This argument, and evidence in support of this argument, make no fact

10

at issue more or less probable, and would instead invite the jury to ignore the evidence before it and the law, as instructed by the Court, by placing the FBI on trial. *See, e.g.*, *United States v. Rushin*, 844 F.3d 933, 940-42 (11th Cir. 2016) (affirming the district court's exclusion of evidence of poor working conditions and unrelated acts of inmate violence at a prison in a prosecution of corrections officers for retaliatory inmate beatings, reasoning that such evidence "would encourage nullification" by suggesting to the jury "that due to the harsh conditions at [the prison], defendants were justified in beating handcuffed prisoners"); *United States v. Abdush-Shakur*, 465 F.3d 458, 466-67 (10th Cir. 2006) (affirming the district court's exclusion of a prison culture expert's testimony on prison conditions and culture because the testimony was "irrelevant to any material issue in the case," where an inmate was charged with assaulting a corrections officer, as it did not excuse the inmate's assault or negate any element of the charged crime).

Finally, the Defendant's proffered witness amounts to an impermissible critique of the underlying investigation. "Under our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty. The jury is not asked to render judgment about non-parties, nor is it normally asked to render a verdict on the government's investigation." *United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998). A defendant may not put the government on trial by arguing that they have engaged in misconduct when, as here, he does not make any connection between the allegedly unfair investigative practices and any evidence introduced at trial. *Id. See also United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994).

The only basis for admissibility of this type of evidence is if it casts doubt on or "undercuts" a piece of evidence admitted by the Government. *Id.* The defendant must create a "requisite connection between the allegedly 'shoddy' or 'slanted' investigation and any evidence introduced at trial." *Id. See also United States v. Patrick*, 248 F.3d 11, 22 (1st Cir. 2001) ("Merely showing that an investigation is sloppy does not establish relevance."); *United States v. Zaccaria*, 240 F.3d 75, 81 (1st Cir. 2001) ("In the absence of a particularized showing that the government was not turning square corners, the district court acted well within its discretion in refusing to let defense counsel embark on a fishing expedition."). Here, the defense cannot make the requisite connection. The defendant in this case was never interviewed by the FBI. He is charged with making false declarations to a *grand jury*. Testimony from the identified witness regarding his personal beliefs and characterizations of the FBI's interactions with the Somali and Muslim communities has no connection to the defendant providing false testimony to the grand jury during its investigation of irregularities in the agent delivery process during the August 2020 primary election.

### III. Potential Legal and Evidentiary Issues

#### A. Factual Stipulation

The government has proposed a factual stipulation regarding the accuracy of the transcripts of the defendant's grand jury testimony that would obviate the need to call the two court reporters who transcribed the defendant's testimony on September 30 and October 14, 2021 and the Somali interpreter who interpreted the testimony on both dates. The government anticipates that the parties will reach agreement as to at least some aspects

of the proposed stipulation and will seek to put any such stipulation on the record at the pretrial conference.

To the extent that the defendant declines to stipulate with respect to the accuracy of the transcripts, the government will call the two court reporters and the Somali interpreter as witnesses in its case in chief.

### B.  Use of Western District of Washington's Unconscious Bias Video

In response to the Court's April 18, 2022 Order documenting the Court's intention to play the Western District of Washington's Unconscious Bias video during juror orientation, the United States does not object to the use of this video.

Dated: April 19, 2022                                         Respectfully submitted,

                                                              ANDREW M. LUGER
                                                              United States Attorney

                                                               /s/ Angela M. Munoz

                                                              BY: ANGELA M. MUNOZ
                                                              KIMBERLY A. SVENDSEN
                                                              Assistant U.S. Attorneys