<pre>
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2

 3    ------------------------------------------------------------
                                   )
      United States of America,    )   File No. 21-cr-245
 4                                 )                (NEB/JFD)
              Plaintiff,           )
 5                                 )
      v.                           )
 6                                 )   Courtroom 13W
      Muse Mohamud Mohamed,        )   Minneapolis, Minnesota
 7                                 )   Tuesday, May 10, 2022
              Defendant.           )   9:04 a.m.
 8                                 )
      ------------------------------------------------------------

 9
                BEFORE THE HONORABLE NANCY E. BRASEL
10                UNITED STATES DISTRICT COURT JUDGE
               (JURY TRIAL PROCEEDINGS - VOLUME II OF II)
11
      APPEARANCES
12     For the Plaintiff:     UNITED STATES ATTORNEY'S OFFICE
                              BY:  ANGELA M. MUNOZ
13                                 KIMBERLY A. SVENDSEN
                              600 United States Courthouse
14                            300 South Fourth Street
                              Minneapolis, Minnesota 55415
15

16     For the Defendant:    CLIPPERT LAW FIRM
                              BY:  CHARLES F. CLIPPERT
17                            101 East Fifth Street, #1500
                              St. Paul, Minnesota 55101
18

19     Court Reporter:       RENEE A. ROGGE, RMR-CRR
                              United States Courthouse
20                            300 South Fourth Street, Box 1005
                              Minneapolis, Minnesota 55415
21

22

23
          Proceedings recorded by mechanical stenography;
24    transcript produced by computer.

25                              *   *   *
</pre>

1                    **I N D E X**

                                                    PAGE

2

    **BLAKE HOSTETTER**
3     Direct Examination by Ms. Svendsen            127
      Cross-Examination by Mr. Clippert             188
4
    Government Rests                                190
5   Defendant Rests                                 197
    Jury Charge Conference                          198
6   Government's Closing Argument                   200
    Defendant's Closing Argument                    214
7   Government's Rebuttal Closing Argument          221
    Court's Instructions                            223
8   Jury Verdict                                    237

9


10  GOVERNMENT EXHIBITS:                           REC'D
      5                                             138

11

12                          *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **IN OPEN COURT**

2                    **(JURY PRESENT)**

3              THE COURT:  We are here today for the second day

4      of trial, and I think we're ready for the government to call

5      its next witness.

6              MS. SVENDSEN:  Thank you, Your Honor.  The

7      United States calls Special Agent Blake Hostetter.

8              THE COURT:  Agent Hostetter, if you just want to

9      come here to take the oath.

10                    <u>BLAKE HOSTETTER</u>,

11     called on behalf of the government, was duly sworn, was

12     examined and testified as follows:

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  Thank you.  And could you please state

15     and spell both your first and last name for the record?

16             THE WITNESS:  Blake Hostetter.  H-O-S-T-E-T-T-E-R.

17             THE COURT:  You may inquire.

18             MS. SVENDSEN:  Thank you, Your Honor.

19                    <u>DIRECT EXAMINATION</u>

20     BY MS. SVENDSEN:

21     Q.  Good morning, Special Agent Hostetter.

22     A.  Good morning, ma'am.

23     Q.  What is your job?

24     A.  I'm a special agent with the FBI.

25     Q.  How long have you been a special agent with the FBI?

1    A.  It will be 11 years in July.

2    Q.  And what do you do as a special agent with the FBI?

3    A.  Currently, I'm assigned to the Minneapolis division

4    working civil rights and public corruption.

5    Q.  Are you one of the case agents in this case

6    United States versus Muse Mohamud Mohamed?

7    A.  Yes, I am.

8    Q.  What does it mean to be a case agent?

9    A.  It means I'm responsible for the overall investigation

10   and making sure all investigative leads are covered.

11   Q.  And are you the only agent working on this case or are

12   there other agents working on it with you?

13   A.  There was others working with me.

14   Q.  All right.  As part of your duties as a special agent

15   with the FBI, have you been involved in investigation

16   involving the August 11th, 2020, primary election?

17   A.  I have.

18   Q.  And as you conducted your investigation, did you develop

19   any particular areas of inquiry that you were focused on?

20   A.  Yes.  We were focused on the absentee ballot agent

21   delivery process.

22   Q.  And, in particular, were there aspects of that agent

23   delivery process that you were focused on?

24   A.  Yes.  Potential ballot fraud, whether or not people were

25   voting ballots without the voters' knowledge.

1    Q.  Okay.  And is that absentee ballot agent delivery

2    process the one that the jury heard about from the very

3    first witness Jon Martin yesterday?

4    A.  Yes, that's correct.

5    Q.  And as part of your investigation, you just testified

6    that you were looking into whether ballots were being

7    submitted without the voters' knowledge; is that correct?

8    A.  That's correct.

9    Q.  And if that was happening, what else were you trying to

10   look into?

11   A.  Who was filling out the ballots and directing that those

12   ballots be turned in.

13   Q.  And so one of the primary goals of your investigation

14   was to determine who was doing that?

15   A.  That's correct.

16   Q.  All right.  As part of your investigation, did you

17   obtain records from the Office of Elections for the City of

18   Minneapolis?

19   A.  We did.

20   Q.  And did those include materials related to ballots that

21   were submitted by the agent delivery process?

22   A.  Yes, ma'am.

23   Q.  Including the ones that the jury has seen as part of

24   this trial?

25   A.  That's correct.

1    Q.  All right.  So when the FBI initially obtained some

2    agent delivery ballot materials from the election office,

3    were there particular ones that the FBI first requested?

4    A.  Yes.  Any that had an error or had been rejected for

5    various reasons.

6    Q.  And why was that?

7    A.  Because those ones would be potentially, you know,

8    problematic for the voters.

9    Q.  Okay.  And was the defendant Muse Mohamed one of those

10   agents who had one or more of his ballots rejected or

11   problematic?

12   A.  Yes, ma'am.

13   Q.  All right.  So in the course of the FBI's investigation,

14   did the FBI obtain an agent delivery log for Muse Mohamed?

15   A.  We did.

16   Q.  And I'm going to show you up on the screen what's

17   already been admitted into evidence as Government's

18   Exhibit 6.  What is this document?

19   A.  That is the Absentee Ballot Agent Return Log for Muse

20   Mohamed.

21   Q.  All right.  And that log indicates that Muse Mohamed

22   acted as an agent for which three voters?

23   A.  Nasro Jama, Sakariye Ahmed, and Abdiriman Muse.

24   Q.  All right.  Did the FBI also interview each of those

25   voters during the course of the investigation?

1   A.  We did.

2   Q.  After interviewing the voters, did you serve Muse

3   Mohamed with a subpoena to testify before the grand jury?

4   A.  Yes, ma'am.

5   Q.  Why did you do that?

6   A.  The grand jury wanted to hear testimony from Mr. Mohamed

7   due to the fact that Ms. Jama's ballot was rejected and the

8   fact the voters did not request an absentee ballot be turned

9   in for them.

10  Q.  So just to back up for a second, what is a subpoena to

11  testify before the grand jury?

12  A.  It is a court order compelling a witness to testify in

13  front of the grand jury.

14  Q.  And what is the grand jury?

15  A.  The grand jury is much like you folks.  They're a group

16  of citizens that were selected by the government; but unlike

17  you who are here to decide guilt in a criminal matter, they

18  are a group of 23 individuals.  It takes 16 of them to

19  create a quorum.  They sit in the jury box, much like you.

20  There's no judge present, but there is the prosecutor and a

21  court reporter in the room.  It's a secret hearing.  And

22  their job is to investigate whether they feel a crime has

23  been committed, so they hear testimony, they look at

24  evidence, and their sole job is to determine if probable

25  cause exists in a particular investigation.

1    Q.  And so fair to say that the grand jury is an

2    investigative body?

3    A.  That's correct.

4    Q.  And I think you testified to this already, but how many

5    people sit on the grand jury?

6    A.  23.  And it takes 16 to have the quorum.

7               THE COURT:  I'm going to slow you down just a

8    little bit for the interpreter.

9               MS. SVENDSEN:  Thank you, Your Honor.

10   BY MS. SVENDSEN:

11   Q.  We'll try to just slow down our questions and answers a

12   bit.

13   A.  Yes, ma'am.

14   Q.  Where does the grand jury meet?

15   A.  They meet at the federal courthouse either here in

16   Minneapolis or in St. Paul.  This particular one we're

17   speaking about today met in St. Paul at the courthouse.

18   Q.  Are you present in the grand jury when a witness is

19   testifying?

20   A.  No, ma'am.

21   Q.  Why not?

22   A.  Because it's a secret hearing.

23   Q.  Who is allowed to be present inside the grand jury room

24   when a witness is testifying?

25   A.  The jury, the court reporter, the prosecutor, the

1    witness and, depending on the witness, potentially a

2    translator.

3    Q.  Okay.  Now, in this investigation have you testified

4    before the grand jury?

5    A.  Not in this investigation, no.

6    Q.  In other cases that you've worked on as an agent, have

7    you testified as a witness before the grand jury?

8    A.  I have.

9    Q.  Can you walk us through what that process is like?

10   A.  It looks just like what just happened today.  I'm called

11   to the witness stand in front of the jury.  I'm given the

12   oath, swearing that I will be truthful.  And then the

13   question and answer session starts.

14   Q.  And is that oath that you take when you raise your right

15   hand before the grand jury the same or very similar to the

16   oath that you took this morning?

17   A.  It's identical, yes.

18   Q.  Okay.  And now you testified that you are asked

19   questions and you answer them.  Who do those questions come

20   from?

21   A.  They come from the prosecutor, and then the jury is

22   actually given a chance to ask their own questions.

23   Q.  And besides answering questions, do you also at times

24   look at exhibits as a witness?

25   A.  Yes, ma'am.

1    Q.  All right.  So in general terms, what was this grand

2    jury investigating at the time that Muse Mohamed was called

3    to testify?

4    A.  Like I stated earlier, they were investigating whether

5    or not through the absentee agent delivery process ballots

6    were being turned in without the voters' knowledge and, if

7    so, who was filling out those ballots and giving the

8    direction to do so.

9    Q.  And with regard to Muse Mohamed's testimony, did that

10   relate to the August 11th, 2020, primary election?

11   A.  Yes, ma'am.

12   Q.  All right.  Now, you testified that you served Muse

13   Mohamed with a subpoena to testify before the grand jury; is

14   that right?

15   A.  That's correct.

16   Q.  Do you see Muse Mohamed in the courtroom today?

17   A.  I do.

18   Q.  Can you identify him?

19   A.  He's the gentleman in the blue tie with the mask on and

20   the headphones on.

21         MS. SVENDSEN:  And, Your Honor, may the record

22   reflect that Special Agent Hostetter has identified the

23   defendant?

24         THE COURT:  The record will so reflect.

25

1    BY MS. SVENDSEN:

2    Q.   When you served Mr. Mohamed with the grand jury

3    subpoena, how did you communicate with him about the

4    logistics for his testimony?

5    A.   In English.

6    Q.   And did you have any issues communicating with him?

7    A.   Actually, no.  I actually left the meeting thinking he's

8    a very friendly guy that spoke very good English.

9              MR. CLIPPERT:  Objection.  Irrelevant.

10             THE COURT:  Overruled.  You may continue.

11             THE WITNESS:  I personally have struggled to learn

12   a second language.  I've been trying to learn Russian

13   forever.  And so when somebody speaks a second language so

14   well, it always sticks out in my mind, and that's how I felt

15   the day I met Mr. Mohamed.

16   BY MS. SVENDSEN:

17   Q.   Now, just to sum up, what kind of information was the

18   investigative team seeking to obtain through Muse Mohamed's

19   grand jury testimony?

20   A.   The grand jury was trying to determine where he actually

21   got the ballots from.

22   Q.   All right.  How many times did Muse Mohamed testify

23   before the grand jury in this case?

24   A.   Twice.  Once September 30th, 2021, and once

25   October 14th, 2021.

1    Q.  And were transcripts created of that testimony?

2    A.  They were.

3    Q.  In general terms, how are the transcripts created?

4    A.  Just like here today, there's a court reporter that sits

5    in there and takes notes.  And then after the grand jury,

6    whatever process the court reporter follows to create a

7    transcript; and then at the end of the completion of the

8    transcript, the court reporter signs that the transcripts

9    are full and complete.

10   Q.  And I'm going to show you a document that's already in

11   evidence as grand jury -- or as Government Exhibit 23, the

12   stipulation of facts that the jury saw yesterday.

13           It refers to testimony on September 30th, 2021,

14   and October 14th, 2021.  Are those the two dates when

15   Mr. Mohamed testified before the grand jury?

16   A.  That's correct.

17   Q.  And after those dates, what does the stipulation say

18   about the transcripts?

19   A.  "The parties agree the transcripts of the defendant's

20   testimony before the grand jury were created and that the

21   transcripts are complete and accurate representations of

22   what was said aloud during the proceedings."

23   Q.  All right.  Have you reviewed those two transcripts?

24   A.  I have.

25   Q.  And you testified that the grand jury proceedings are

1    secret.  Can you just explain how it is that you are able to

2    review the transcripts?

3    A.  Just as a rule of the court, the transcripts are

4    material to my investigation; and being part of the

5    prosecution team, I have the right to see them.

6    Q.  Okay.  And you also testified that sometimes you're

7    shown exhibits as a witness in the grand jury; is that

8    right?

9    A.  That's correct.

10   Q.  Based on your review of Muse Mohamed's grand jury

11   transcripts, was he shown exhibits during his testimony?

12   A.  He was.

13   Q.  Did you review those exhibits prior to your testimony?

14   A.  I did.

15   Q.  And do they include some exhibits that the jury has seen

16   as part of this trial?

17   A.  Yes, ma'am.

18          MS. SVENDSEN:  Your Honor, I'd like to show the

19   witness a document on the screen that's been marked, but not

20   yet admitted, as Government's Exhibit 5.  May I do so?

21          THE COURT:  Yes.  Just one moment.  Yes.

22   BY MS. SVENDSEN:

23   Q.  All right.  I'm showing you up on your screen what's

24   been marked as Government's Exhibit 5.  Can you tell us what

25   is it?

1    A.  It is a spreadsheet.  I think the intent is to help the

2    jury understand the grand jury exhibit numbers versus the

3    trial exhibit, because the exhibits shown in grand jury was

4    one large exhibit.  Grand Jury Exhibit 39.  For trial it's

5    been broken into pieces for ease for the witnesses.

6    Q.  And is Government's Exhibit 5 a true and accurate

7    comparison of the exhibits that were shown during Muse

8    Mohamed's grand jury testimony to the exhibits that have

9    been received into evidence during this trial?

10   A.  Yes, ma'am.

11   Q.  Will it assist the jury in following the questions and

12   answers contained in the transcripts?

13   A.  I think so.

14        MS. SVENDSEN:  Your Honor, I offer Government

15   Exhibit 5.

16        THE COURT:  Any objection?

17        MR. CLIPPERT:  No objection, Your Honor.

18        THE COURT:  Exhibit 5 is admitted.

19        MS. SVENDSEN:  Okay.  So now I would like to

20   publish Government's Exhibit 5 up on the screen to the jury.

21        THE COURT:  You may do so.

22   BY MS. SVENDSEN:

23   Q.  And does this chart, Special Agent Hostetter, contain

24   every single exhibit that was shown during Muse Mohamed's

25   grand jury testimony?

1    A.  No, ma'am.

2    Q.  And, specifically, it shows the ones that were actually

3    admitted into evidence in this trial; is that correct?

4    A.  That's correct.

5    Q.  And you've explained this once already, but now that

6    it's on the screen in front of the jury, what's the primary

7    difference between the way the exhibits were numbered for

8    purposes of the grand jury versus during this trial?

9    A.  So during grand jury, Grand Jury Exhibit 39 was one

10   large document.  For trial here today, for ease to show the

11   witnesses, they've been broken into, like, by page number.

12   Exhibit 39 has been broken down to -- for example, page 1

13   and 2 is Exhibit 6.

14   Q.  And so, for example, in the transcript, if the jurors

15   see a reference to Grand Jury Exhibit 39 at page 1, where

16   can they look to see that same document?

17   A.  Trial Exhibit 6.

18   Q.  Okay.  Now, I'm going to show you up on the screen

19   what's already in evidence as Government's Exhibit 4.  Can

20   you tell us, sir, what is this document?

21   A.  This is the transcript from September 30th, 2021,

22   Mr. Mohamed's testimony before the grand jury.

23   Q.  And is that the first of his two sessions of grand jury

24   testimony?

25   A.  Yes, ma'am.

1    Q.   Where did that testimony take place?

2    A.   In St. Paul in front of the grand jury.

3    Q.   And that courthouse, I take it, is within the State and

4    District of Minnesota?

5    A.   Yes, ma'am.

6    Q.   All right.  Continuing on to page 2 of Government's

7    Exhibit 4, I want to take a look right up at the top of it.

8    It starts out, "Whereupon, Osman Abdulle, having been duly

9    sworn by the foreperson of the grand jury, interpreted and

10   translated as follows:"  Who is Osman Abdulle?

11   A.   The Somali translator that was used that day.

12   Q.   And is that the translator that the jury heard from

13   yesterday afternoon?

14   A.   Yes, ma'am.

15   Q.   And then down below that it continues, "Muse Mohamed,

16   called as a witness herein, having been first duly sworn by

17   the foreperson of the grand jury."  What does that mean?

18   A.   It means he took the oath to be honest in front of the

19   grand jury.

20   Q.   And is that that same oath that you testified earlier

21   when you raised your right hand that you took today?

22   A.   Yes, ma'am.

23   Q.   And that the jury has heard the witnesses taking

24   throughout this trial?

25   A.   Yes, ma'am.

1    Q.  All right.  Now, before we talk about some of the

2    statements in here, I want to go to the last page of

3    Government's Exhibit 4, which is page 32.  What is on the

4    very last page of this transcript?

5    A.  So that is the signature page that I spoke of earlier

6    where the court reporter signs and notarizes that the

7    transcript is full, true and complete.

8    Q.  And in this case the court reporter has certified that

9    that September 30th transcript is full, true and complete?

10   A.  That's correct.

11   Q.  All right.  So returning back to page 3 of Government's

12   Exhibit 4, I want to talk about the very first thing that

13   happens at the outset of the testimony.

14          And where we see those Qs and As in the

15   left-hand-side column, can you explain what that shows in

16   the transcript?

17   A.  Sure.  The Q is the question from the prosecutor, and

18   the A is the answer from the witness.

19   Q.  And so just to go over these first ten lines of the

20   transcript, I'm going to read the question that the

21   prosecutor read and if you could provide the answer, so we

22   can review this with the jury.  Let's do it that way.

23          So question, "Before we get started, Mr. Mohamed,

24   is it correct you speak and understand some English?"

25   A.  "Yes."

1    Q.  "Today as we're talking if you'd like to answer in

2    English, you may."

3    A.  "Okay."

4    Q.  "If at any point you need assistance, Mr. Abdulle is

5    here to help you."

6    A.  "Okay."

7    Q.  All right.  And then -- whoops.  Let's take us back to

8    page 3 of Government Exhibit 4.  Right after that, what is

9    the first thing that happens in the transcript before

10   Mr. Mohamed is asked any substantive questions?

11   A.  The prosecutor explains his rights.

12   Q.  And the prosecutor starts out, "The first thing I'd like

13   to talk to you about this morning is the rights you have in

14   front of this grand jury."

15   A.  "Okay."

16   Q.  "First, do you understand you have the right to have an

17   attorney with you here today?"

18   A.  "Yes."

19   Q.  "In fact, you do have an attorney sitting just outside

20   the door.  Correct?"

21   A.  "Yes."

22   Q.  "If at any point during this proceeding you need to

23   speak to that attorney, please just let me know.  Okay?"

24   A.  "Okay."

25   Q.  "You understand you also have the Fifth Amendment right

1    not to incriminate yourself.  Correct?"

2    A.  "Correct."

3    Q.  "You understand that right only applies to you?"

4    A.  "Yes."

5    Q.  "So if I ask you a question that you feel might get

6    someone else in trouble, you still do have to answer the

7    question."

8    A.  "Yes."

9    Q.  "You understand that you've just been placed under oath.

10   Correct?"

11   A.  "Yes, very much so."

12   Q.  "I don't think you're going to lie, but just know that

13   you need to answer truthfully all of the answers placed

14   before you today.  Okay?"

15   A.  "Fine."

16   Q.  "Do you have any questions about your rights, sir?"

17   A.  "No."

18   Q.  All right.  Now, we're not going to go through this

19   transcript in its entirety in front of the jury, but will

20   the jury have access to this whole transcript in the grand

21   jury room should they like to review any portion of it?

22   A.  Yes, you will.

23   Q.  And so just to hit upon a couple of relevant portions of

24   this transcript, I'm going to take us over to page 12 of

25   Government's Exhibit 4, starting at line 4.

1        Did the prosecutor during the testimony ask Muse

2    Mohamed some questions about dropping off absentee ballots

3    for other people?

4    A.  Yes, ma'am.

5    Q.  And if we start out at line 4, "Did someone instruct you

6    to do this?  Did someone tell you to go out and collect

7    ballots?"

8    A.  "No.  But everyone was doing that.  Everybody was doing

9    that.  You know, some of the people did not speak English.

10   So we'd just tell them when it needs to be done because the

11   language barriers.  My job was not to transport people to

12   the voting places.  My job was to pick up those sealed

13   envelopes and I would take three envelopes at a time, just

14   three at any given time.  I was not allowed to pick up more

15   than three at any given time."

16   Q.  "Okay.  That makes sense.  Can you tell me who told you

17   that it was your job to do this?"

18   A.  "As part of the volunteering, as part of" -- excuse

19   me -- "as part of the door knocking.  So if you come across

20   someone who has a sealed envelope, a filled-out, sealed

21   envelope, that was one thing that we'd do for that person,

22   is to pick up that envelope on their behalf and drop them

23   off.  That's only if we came across someone who has those

24   filled out, sealed envelopes.  Because at the time I was a

25   student and I was doing my final semester at school, so I

1   wasn't doing a lot of volunteering at that point."

2   Q.  "So who was it that told you to go out and collect the

3   envelopes or to go out and go door knocking?"

4   A.  "No one told me to do any of those specific things.  But

5   as part of volunteering, it's to go out and talk to the

6   community.  That's part of what we were doing, just general

7   things."

8   Q.  Special Agent Hostetter, is this questioning related to

9   the investigation you testified about earlier into where

10  these ballots came from?

11  A.  Directly related, yes.

12  Q.  And if we continue on to page 16 of Government's

13  Exhibit 4, beginning at line 9, is Muse Mohamed asked some

14  follow-up questions about delivering absentee ballots?

15  A.  Yes, ma'am.

16  Q.  And starting from line 9, "Now, one of the things you

17  did as part of your campaign work was you helped some people

18  get their ballots delivered somewhere in Hennepin County.

19  Right?"

20  A.  "Some of the people, they would have sealed envelopes.

21  They would ask us to take the sealed envelopes to the

22  government center.  So because of the pandemic, sometimes

23  they would ask us to take those.  For me, my main task was

24  to do the door knocks.  There are other people in the group

25  who would transport some of the voters and take them to the

1    voting stations, but that wasn't me.  My task primarily was

2    to door knock."

3    Q.  "When you dropped off those ballots, was it at the

4    Hennepin County Government Center?"

5    A.  "Yes, correct.  That was the only location that we'd

6    take those envelopes."

7    Q.  "So that's downtown Minneapolis.  Correct?"

8    A.  "Yes."

9    Q.  "Earlier you mentioned you would do three at a time.

10   Correct?"

11   A.  "Yes.  Everyone was allowed to transport three sealed

12   envelopes at a time."

13   Q.  "You say everyone.  Was there more than one person

14   transporting envelopes?"

15   A.  "The people that were doing certain functions for the

16   campaign, there were hundreds of people.  So I'm just

17   talking about what I noticed myself."

18   Q.  "Did you see other people transporting those ballots

19   too?"

20   A.  "At the Hennepin County Government Center, there were

21   other people there from different campaigns, other

22   campaigns, but I did not know those people."

23   Q.  "Where did you get the ballots that you brought to the

24   government center?"

25   A.  "From I remember, I wasn't allowed to transport not more

1    than three envelopes at any given time.  From what I recall,

2    there were" --

3    Q.  Do you need me to go back?

4    A.  Yes, please.

5    Q.  All right.  So back to page 17.  Sorry about that.

6    A.  -- "there were people calling the campaign office asking

7    for help.  Most of these were elderly or frail people that

8    would need help getting out some of the papers that they

9    needed to vote."

10   Q.  "So people would call the campaign office and ask for

11   help.  Is that right?"

12   A.  "Yes, they would call in and ask for help."

13   Q.  "Would you go to their house and pick up their ballot

14   from them?"

15   A.  "The campaign manager gave us tasks and, for example,

16   would instruct me and say, okay, those individuals called

17   the office and you need to go there and if they have sealed

18   envelopes or filled out applications in a sealed envelope,

19   you can grab those and drop them off on their behalf."

20   Q.  "So you'd go to their house and pick up their envelope

21   from them?"

22   A.  "If the manager would ask you to do that, yes, you'd do

23   that.  Like I said, for me, my job mainly was just doing the

24   door knocking."

25   Q.  "You said you did turn in at least three ballots that

1    you remember.  Right?"

2    A.  "Yes, I remember for me -- speaking for myself, I

3    remember, yes, transporting three envelopes, but I can't

4    remember who those people were or where they were at.  Like

5    I said, I don't know the names of those individuals or who

6    they were at this time.  But if those people already voted

7    in person or absentee voting, you just leave them alone.

8    It's only if they did not vote yet that you grabbed those

9    envelopes on their behalf."

10   Q.  "How would you know if they already voted?"

11   A.  "You just asked them if they voted already or not.  If

12   they did not, they would say, no, I did not."

13   Q.  "So they would call a campaign office and they would ask

14   for help.  You'd go to their house.  You'd ask them if they

15   already voted or not.  If they didn't, you'd take their

16   absentee ballot to the government center.  Is that right?"

17   A.  "Yes, but if they give you permission to do so on their

18   behalf."

19   Q.  All right.  I'm going to move us forward to page 20 of

20   Government's Exhibit 4, Special Agent Hostetter.  And

21   starting at line 9, do you see there's a reference here to

22   an exhibit?

23   A.  I do.

24   Q.  And that's Exhibit 39?

25   A.  Correct.

1    Q.  Have you reviewed Exhibit 39 from the grand jury?

2    A.  Yes, ma'am.

3    Q.  And just returning us back for a second to that chart

4    that you testified about before, Government's Exhibit 5, as

5    the prosecutor starts out talking about the beginning of

6    Grand Jury Exhibit 39, what is that document?

7    A.  It's the ballot paperwork for -- I'm sorry.  Can you

8    repeat the question?

9    Q.  Well, as the prosecutor begins to ask questions about

10   the very initial pages of Grand Jury Exhibit 39, what are

11   those first pages?

12   A.  The first pages of Exhibit 39 are the absentee ballot

13   return log for Muse Mohamed.

14   Q.  Okay.  And so if we go back to page 20 of Government's

15   Exhibit 4, I'm going to see if I can put that up along with

16   Government Exhibit 6, which was showing on your chart as the

17   first pages of Government Exhibit -- Grand Jury Exhibit 39.

18   Is that correct?

19   A.  That's correct.

20   Q.  All right.  And so where it starts out at line 9 and

21   says, "For the record, I am showing the witness what has

22   previously been marked as Exhibit 39."  And then skipping

23   down, the prosecutor continues on line 13, "Mr. Mohamed, do

24   you see at the top here it says Muse Mohamed?"

25   A.  "Yes."

1    Q.  And, Special Agent Hostetter, is that referring to this

2    Absentee Ballot Agent Return Log?

3    A.  Yes, ma'am.

4    Q.  Okay.  And it continues on at line 16, "Does this look

5    like a document that you filled out, sir?"

6    A.  "Is this pertaining to the three witnesses that we

7    talked about?"

8    Q.  "First, did you fill out this document?"

9    A.  "Yes, this is my handwriting.  Yes, that's my

10   handwriting."

11   Q.  "Now, this is a list of people that you delivered

12   ballots for.  Do you see how it talks about the fact that

13   it's an Absentee Ballot Agent Return Log?"

14   A.  "I see that."

15   Q.  "Do you recall going and picking up absentee ballots for

16   the people listed on this form?"

17   A.  "Yes, I remember that I acted as an agent for three

18   individuals, yes.  Yes, I recall that I was acting as an

19   agent for three individuals."

20   Q.  "Do you actually know any of these people?  There's

21   Nasro Jama.  There's Sakariye Ahmed.  And we have Alah Muse.

22   Do you know any of those people?"

23   A.  "I don't know those individuals personally.  I'm not

24   acquainted with them, but those were people that I was sent

25   to collect those ballots from.  So those were the people

1    that I was assigned to go and get those ballots from."

2    Q.  "So you don't know these people personally.  They're not

3    friends or family.  Correct?"

4    A.  "No, no."

5    Q.  "I know you don't remember what they look like or

6    anything, but do you remember going to these addresses and

7    actually picking up the ballots from them in person?"

8    A.  "Yes, I remember I was at those addresses, yes."

9    Q.  "Was it the voter, the person that voted, who actually

10   handed you the ballot?"

11   A.  "Yes.  Those were the voters.  They would say, okay, I

12   filled out the paperwork.  You just have to take the ballots

13   and drop them off on their behalf."

14   Q.  All right.  Now I'm going to take us out of this

15   split-screen mode and over to page 23 of Government

16   Exhibit 4.

17          So beginning from line 8 of page 23, was

18   Mr. Mohamed asked some questions about how he verified that

19   these voters were the right people?

20   A.  He was.

21   Q.  So starting at line 8 it begins, "Earlier you told us

22   that you would make sure that people hadn't already voted.

23   Is that right?"

24   A.  "Yes.  We always checked to make sure that they hadn't

25   voted already.  If they have not, then you'd pick up the

1    forms and drop them off on their behalf."

2    Q.  "Do you recall doing that when you picked up these three

3    ballots, that you made sure these people hadn't already

4    voted?"

5    A.  "Yes, I made sure that I asked that question, whether

6    they voted or not.  And they had said that they had not

7    voted yet."

8    Q.  "Did you do anything else to verify who these people

9    were when you picked up their ballots?"

10   A.  "No.  Number one, you'd ask if they voted or not.  If

11   they say they have not, number two thing was to pick up

12   those ballots on their behalf and act as their agent and

13   deliver those ballots to the center on their behalf."

14   Q.  "Did you check their IDs to make sure they were who they

15   said they were?"

16   A.  "Yes, whether they filled out the paperwork or not, you

17   always ask for their ID and check their ID and make sure

18   they are who they claim to be."

19   Q.  "Just to be very clear, when you met Nasro Jama, you

20   would have asked for her ID and you would have made sure it

21   was her.  Right?"

22   A.  Excuse me.  "I'd ask if she was Nasro Jama, but I

23   wouldn't demand to see her ID."

24   Q.  "What about Sakariye Ahmed, do you know if you verified

25   it was him when you were speaking with him?"

1    A.   "Yes.  He mentioned to me that he was him."

2    Q.   "Do you remember talking to Mr. Ahmed?"

3    A.   "I do recall I went to his place.  I met him and I

4    grabbed his ballots from him.  Then he gave me the

5    permission to deliver these ballots on his behalf."

6    Q.   "Did you check his ID to make sure he was who he said he

7    was?"

8    A.   "I cannot remember whether he gave me his ID or not.  I

9    can't remember that at the moment."

10   Q.   "What about Mr. Abdiriman Muse, do you remember meeting

11   him?"

12   A.   "It was one of the three people that I acted as their

13   agent."

14   Q.   "Do you remember actually going to his house and meeting

15   him?"

16   A.   "I remember that I was at his address, but I don't

17   remember the details of what went on when I was there.  But

18   I remember that he gave me the envelope and I delivered that

19   envelope on his behalf."

20   Q.   Okay.  Now, as we go forward here into the next

21   question, you see that it refers to the third page of

22   Exhibit 39; is that correct?

23   A.   That's correct.

24   Q.   And if we go back over to the chart at Government

25   Exhibit 5, what is the third page of Grand Jury Exhibit 39?

1    A.  It correlates with Trial Exhibit 7.  It's the Request

2    for Agent Delivery of Absentee Ballot from Nasro Jama.

3    Q.  And so if we go back to page 25 of Government Exhibit 4,

4    I'm going to see if I can put that exhibit, Government

5    Exhibit 7, up on the right-hand side.

6           And beginning at line 14, the questioning

7    continues, "One more question here.  I'm showing you the

8    third page of Exhibit 39.  At the top it's called Request

9    for Agent Delivery of Absentee Ballot.  Do you see that?"

10   A.  "Yes."

11   Q.  "Do you see at the bottom you're listed as the agent,

12   Muse Mohamed?"

13   A.  "Correct."

14   Q.  "Do you recall filling out this piece of paper with

15   Nasro Jama in order to be the agent for her?"

16   A.  "I think we filled out the paperwork on the form while

17   she was with me."

18   Q.  "Is this your handwriting?  This is your signature

19   here?"

20   A.  "The signature is mine."

21   Q.  "Did you fill out the rest of the form as well?"

22   A.  "She did."

23   Q.  "She did?"

24   A.  "She did."

25   Q.  "So Nasro Jama filled out her own name?"

1    A.   "Yes."

2    Q.   Okay.  Now, moving forward through this transcript, does

3    the prosecutor walk through with Muse Mohamed some more of

4    these ballot-related documents?

5    A.   Yes.

6    Q.   And so if we move down to line 21 where it talks about

7    the fifth page of the exhibit, we're looking at a copy of

8    the outside of an envelope.  Do you see that?

9    A.   I do.

10   Q.   And I'm going to see if I can put up on the right side

11   Government's Exhibit 9.

12           The prosecutor continues on at line 23, "Does that

13   look similar to the envelopes that you delivered?"

14   A.   "Can you zoom in?"

15   Q.   And, Special Agent Hostetter, does that refer to, you

16   know, similar to you having this up on the screen today, are

17   grand jury witnesses sometimes shown exhibits up on the

18   screen just like this?

19   A.   Exactly like this, yes.

20   Q.   Okay.  So let's see on the next page, if we zoom in at

21   page 27.  The prosecutor responds, "Sure."

22   A.   "Probably it looks like this.  I believe it looks like

23   this."

24   Q.   "Is this your signature here on the line that says Agent

25   Name?"

1    A.   "The signature is mine."

2    Q.   "Do you know who Mustafa Hassan is?"

3    A.   "Yes, I do know who Mustafa is."

4    Q.   "How do you know Mr. Mustafa Hassan?"

5    A.   "He was one of the people working for the campaign."

6    Q.   "Was Mr. Hassan with you when you picked up Nasro Jama's

7    ballot?"

8    A.   "I believe so.  I believe so."

9    Q.   And then they go on to talk about Mr. Hassan's phone

10   number; is that correct?

11   A.   That's correct.

12   Q.   And so let's skip down to line 24 where the questioning

13   continues.  "Just to be clear, when you" -- oh, goodness.

14   Let me see if I can put that back up.

15        On the left side we were at page 27 of Government

16   Exhibit 4.  And then on the right side we were looking at

17   Government Exhibit 9.  And we were about to pick up from

18   line 24 there.

19        "Just to be clear, when you went to pick up this

20   absentee ballot, Mr. Hassan, he was with you at that time?"

21   A.   "Hassan was with me, yes."

22   Q.   All right.  Now, Special Agent Hostetter, is Mustafa

23   Hassan a witness that the jury has heard from during this

24   trial?

25   A.   Yes, he spoke yesterday.

1    Q.  And can you please remind the jury of his testimony

2    about whether he went with Muse Mohamed to pick up Nasro

3    Jama's ballot?

4              MR. CLIPPERT:  Objection.  Irrelevant.

5              THE COURT:  Sustained.

6    BY MS. SVENDSEN:

7    Q.  That is a witness that the jury heard from yesterday

8    afternoon with regard to this very same ballot; is that

9    correct?

10   A.  Yes, ma'am.

11   Q.  All right.  Now, let's move down a little bit further in

12   the page to line 11.  Do you see where there's a reference

13   to the paperwork for Sakariye Ahmed?

14   A.  I do.

15   Q.  And on the right-hand side, I'm going to call up

16   Government's Exhibit 12.

17              So starting at line 11, the prosecutor asks,

18   "Here's the paperwork for Sakariye Ahmed.  Do you see your

19   signature on this page?"

20   A.  "Yes, my name is there by the agent.  I see my name

21   there."

22   Q.  "Is that your handwriting?  Did you write this?"

23   A.  "The handwriting looks like my handwriting."

24   Q.  And I'm going to walk you through a couple more of these

25   ballot-related documents.  And if we pick up on line 14 --

1        THE COURT:  We're on page 28 of Exhibit 4.

2        MS. SVENDSEN:  Thank you, Your Honor.

3   BY MS. SVENDSEN:

4   Q.  All right.  Down at line 22 of page 28, do you see where

5   it refers to an envelope?

6   A.  Yes.

7   Q.  And on the right-hand side, I'm going to show you

8   Government's Exhibit 14.

9        And we'll start at line 22 where it indicates, "Do

10  you see we have another envelope here?  Do you see that?"

11  A.  "Yes."

12  Q.  "It has again Sakariye Ahmed at the top.  Is this your

13  handwriting at the agent name where it says Muse Mohamed?"

14  A.  "Yes, the handwriting next to the agent name is my

15  handwriting."

16  Q.  And then continuing on line 10 of page 29, the

17  prosecutor asks, "Do you remember if Mr. Mustafa Hassan was

18  with you when you picked up this ballot?"

19  A.  "I cannot remember whether he was with me or not.  He

20  may or may not."

21  Q.  And then I want to take a look at line 5 of page 29

22  where it refers to a Request for Agent Delivery of Absentee

23  Ballot for Abdiriman Muse.  Do you see that?

24  A.  I do.

25  Q.  So on the right-hand side, I will show you that document

1    Government Exhibit 10.

2              So in the transcript it continues on line 7, "Is

3    this your handwriting here where it says Agent Name?"

4    A.  "Correct, that's my handwriting."

5    Q.  All right.  Now, I want to take you, Special Agent

6    Hostetter, over to what's already been admitted in evidence

7    as Government's Exhibit 1.  What is this document?

8    A.  That is the transcript from October 14th, 2021,

9    reflecting Muse Mohamed's testimony in front of the grand

10   jury.

11   Q.  And where did that testimony take place?

12   A.  In the District of Minnesota in St. Paul.

13   Q.  And to be clear, that courthouse is within the State and

14   District of Minnesota, correct?

15   A.  Yes, ma'am.

16   Q.  All right.  So similarly to the last transcript, if we

17   take a look up at the top of page 2 of Government's

18   Exhibit 1, what happens at the very beginning of the

19   transcript?

20   A.  It indicates that Mr. Abdulle was sworn as the Somali

21   interpreter and that Mr. Mohamed took the oath to be honest.

22   Q.  And so this transcript reflects that he was sworn in

23   again under oath to testify?

24   A.  That's correct.

25   Q.  All right.  And, again, similar to last time, if we go

1  over to the very last page of this transcript, page 56 of

2  Government's Exhibit 1, what do we see on the back of this

3  exhibit?

4  A.  It is the certificate page where the court reporter

5  certifies that the transcript from the testimony of

6  Mr. Mohamed is full, true and complete.

7  Q.  And I want to start out back on page 2 of Government's

8  Exhibit 1 just below where the interpreter is sworn in and

9  everybody gets settled.  What happens again at the very

10 beginning of the October 14th, 2021, testimony?

11 A.  The prosecutor explains Mr. Mohamed's rights while in

12 grand jury.

13 Q.  And if we go over to page 3 of Government's Exhibit 1,

14 let's review for the jury those rights, starting with

15 line 3, where the prosecutor says, "First, you understand

16 that you have the right to have an attorney be here with you

17 today?"

18 A.  "Correct."

19 Q.  "And you have an attorney sitting right outside the

20 courtroom.  You understand you can stop this process and

21 speak to him any time you'd like?"

22 A.  "Correct."

23 Q.  "You also understand that you have the Fifth Amendment

24 right to remain silent?"

25 A.  "Correct."

1    Q.  "So basically if I ask you a question that could

2    incriminate you, you have the right to not answer that

3    question.  Do you understand?"

4    A.  "Correct."

5    Q.  "Okay.  Lastly, I want to talk to you about your

6    obligation here today.  You understand that your only job

7    here today is to tell myself and the rest of the grand jury

8    the truth?"

9    A.  "Very much so."

10   Q.  "And you understand that the truth means the whole and

11   complete truth, right?"

12   A.  "Very much so."

13   Q.  "So if any of us asks you questions, not only do you

14   need to tell us the truth, but you can't omit or leave

15   anything out of your answer."

16   A.  "Very much so."

17   Q.  "And you understand that if you don't tell the truth

18   today, because you've just been placed under oath, you could

19   be charged with a crime?"

20   A.  "Very much so.  Thank you."

21   Q.  All right.  Now, before we start to talk about the

22   substantive questions and answers from this October 14th

23   testimony, I want to ask you about some background related

24   to this testimony.

25            First of all, this took place about how long after

1    Mr. Mohamed's initial appearance before the grand jury?

2    A.  About two weeks.

3    Q.  Why was Muse Mohamed subpoenaed to come back to the

4    grand jury a second time?

5    A.  The grand jury felt that he still had more information

6    to provide and to give him an opportunity to provide full

7    answers to the questions and tell the truth.

8    Q.  All right.  And if we again go forward to some of the

9    substantive portions -- we won't read the jury this 56-page

10   transcript, but will they again have access to the entire

11   transcript during their deliberations?

12   A.  Yes, you will.

13   Q.  And I want to go over to page 17 of Grand Jury

14   Exhibit 1.  We're going to start with line 14 of page 17.

15            And during this portion of Mr. Mohamed's

16   testimony, does he explain his understanding of the agent

17   delivery process?

18   A.  Yes.

19   Q.  So starting at line 14, the question is, "So the agent

20   paperwork is paperwork you dropped off at the northeast

21   Minneapolis office, correct?"

22   A.  "So when the ballot papers come, people fill them out

23   and you become an agent for them, you sign a separate form,

24   and that's -- there's three pieces.  You take those three

25   pieces to the elections office.

1        "So you take the three ballot forms and, you know,

2    when the people fill them out, there's -- the three ballots,

3    you take those three ballots to the election office, but you

4    have to sign your own separate form when you become an agent

5    for those three ballots.  So that's how you take them.  You

6    take them three at a time.

7        "So when you turn those -- those three ballots to

8    the election office -- actually, there's an election judge

9    there.  And then they would ask for your ID, and then you

10    can turn those three in at the same time you show your ID so

11    they can check you out."

12    Q.  "Okay.  So you remember the last time you were here we

13    looked at this document, right?"

14    A.  "That's right.  We looked at it."

15    Q.  "And this is, for the record, Grand Jury Exhibit 39.

16    Now, is this the document you were talking about that you

17    brought to the northeast Minneapolis election office?"

18    A.  "So this is the agent form.  So you fill this out as an

19    agent, but the -- the people that -- the voters will fill

20    out their own absentee ballots, and you take three at a

21    time.  So when you -- when three individuals fill them out,

22    you take them along with this form to the elections office."

23    Q.  And just to be clear, Special Agent Hostetter, let's see

24    if I can put up on the left side this page we're looking at,

25    page 18 of Government's Exhibit 1, and then on the right

1     side Government's Exhibit 6.  Is this the document that is

2     at the beginning of Grand Jury Exhibit 39?

3     A.  Yes, ma'am.

4     Q.  Okay.  And if we continue on to page 19 of Government's

5     Exhibit 1 -- there we go -- beginning at approximately like

6     lines 11 and 12 there, is Mr. Mohamed asked some questions

7     about an envelope?

8     A.  Yes.

9     Q.  Okay.  And he testifies in response to the question,

10    "Would you also bring something that looked like this?  It

11    would be an envelope."

12    A.  "Yes.  This is the envelope that you -- you put the

13    paperwork in and take to the elections office."

14    Q.  "And you know that this would actually contain the

15    voter's ballot, right?"

16    A.  "Yes.  They would put the actual ballot in the envelope

17    and then they would seal it off and then I would grab it

18    from them and take them."

19    Q.  "Okay.  So for the record we're looking at Grand Jury

20    Exhibit 61."

21         And so if we go back to the chart at Government's

22    Exhibit 5, if the jurors want to find Grand Jury Exhibit 61,

23    where would they find it?

24    A.  Trial Exhibit 19.

25    Q.  And if we take a look at Trial Exhibit 19, what is this

1    document?

2    A.  It's a blank signature envelope.

3    Q.  And that is the signature envelope that he's testifying

4    about in the transcript; is that correct?

5    A.  Yes, ma'am.

6    Q.  And so if we return on the left-hand side to page 19 of

7    Government's Exhibit 1.  On the right-hand side let's take a

8    look at that envelope.

9           And do you see down at the bottom of page 19 where

10   the prosecutor says, "Let's talk about this envelope"?

11   A.  Yes.

12   Q.  And the prosecutor continues, "When you received this

13   envelope, was it sealed already?"

14   A.  "Yes."

15   Q.  "Okay.  Now, did you watch it get sealed or was it

16   handed to you already sealed?"

17   A.  "I would grab it from them and by then it's sealed."

18   Q.  "Okay.  Who is them?"

19   A.  "The person who filled the paperwork out."

20   Q.  "So it's your testimony that you would take these

21   envelopes from the voters themselves?"

22   A.  "The people, the voters would -- that we should get

23   those paper -- paperwork from them, and then we take them to

24   the elections office, but they are sealed by the time we get

25   them, we get those envelopes from them."

1    Q.  And if we skip ahead a few pages to page 25 of

2    Government's Exhibit 1 -- I want to get us back into the

3    single page mode so we can see a little better.  Beginning

4    at line 22, does the prosecutor continue asking Mr. Mohamed

5    where he got these envelopes from?

6    A.  Yes, ma'am.

7    Q.  And the prosecutor asks, "So now I need to know, where

8    did you get these envelopes from?"

9    A.  "So when I take those envelopes -- when I take those

10   envelopes, and those envelopes were sealed when I take them

11   to the elections office, but I get them from the people, the

12   voters, the people who voted, is where I get them from."

13   Q.  "So you're telling me that Nasro Jama handed you this

14   sealed envelope?"

15   A.  "Can I step outside for five minutes?"

16   Q.  "Do you need to step out in the hallway and speak to

17   your attorney?"

18   A.  "Yes."

19   Q.  "Okay.  Let's take a break."

20          And does the transcript then reflect that a recess

21   is taken?

22   A.  It does.

23   Q.  For about how long?

24   A.  Approximately 20 minutes.

25   Q.  All right.  And then when the grand jury goes back on

1    the record after that break, does the prosecutor remind

2    Mr. Mohamed that he's still under oath to tell the truth?

3    A.  Yes, ma'am.

4    Q.  And if we continue on to the next page, page 29 of

5    Government's Exhibit 1, I'm going to focus us in on a

6    question and answer that begin at line 7 here of page 29.

7              And, Special Agent Hostetter, is this the question

8    and answer that forms the basis for Count 1 of the

9    indictment?

10   A.  It is.

11   Q.  Okay.  So starting at line 8, the prosecutor asks, "What

12   I need to do is, did you pick up any ballots and actually

13   bring them to the voters?"

14   A.  "Okay.  So I got three absentee ballots from the

15   elections office.  I took -- I took those ballots to the

16   voters, they filled them out, they voted, and then I took

17   them back and turned those -- I turned those absentee

18   ballots back to the elections office."

19   Q.  And so those statements in lines 11 through 15 are the

20   ones with which Muse Mohamed is charged in Count 1?

21   A.  That is correct.

22   Q.  And if we move on to page 31 of Government's Exhibit 1,

23   does that contain the answers with which Muse Mohamed is

24   charged in Count 2?

25   A.  Yes, ma'am.

1    Q.  And let's read those beginning with line 3.  "I am

2    talking about if you picked up an absentee ballot and

3    brought it to Nasro Jama.  Did you do that?"

4    A.  "I got the absentee ballot from the elections office and

5    took it to Nasro Jama."

6    Q.  "So you're saying that you picked up a blank absentee

7    ballot from the election office and you brought that

8    directly to Nasro Jama?"

9    A.  "You know, from what I remember, if my memory is

10   correct, I remember Nasro Jama was the one who filled out

11   the absentee ballots -- or the absentee ballot, sealed it

12   up, and then told me to drop it off for her."

13   Q.  And so these statements about Nasro Jama's ballots are

14   the statements charged in Count 2 of the indictment; is that

15   correct?

16   A.  Yes, ma'am.

17   Q.  All right.  Moving a few pages forward to page 34 of

18   Government's Exhibit 1, does there come a point in the

19   testimony when the AUSA goes ahead and tells Mr. Mohamed

20   that the voters say they didn't ask him to be their agent?

21   A.  Yes, ma'am.

22   Q.  And then gives him a chance to answer again?

23   A.  Yes, ma'am.

24   Q.  And so let's start at the very top of page 34 where the

25   prosecutor says, "Who gave you this envelope to drop off at

1    the election office?"

2    A.  "The voter."

3    Q.  "So you're telling me that you got this envelope from

4    Nasro Jama?"

5    A.  "Yes, the voter.  The voter."

6    Q.  "Okay.  Mr. Mohamed, I'm going to represent to you that

7    that's not possible, because we have spoken to the people on

8    this list and they not only don't know you, but they did not

9    ask you to be their agent.

10           "So I'm going to ask you again and I'm going to

11   remind you that you are under oath.  Who gave you the

12   envelopes to bring to the election office?"

13   A.  "The absentee ballots?"

14   Q.  "Yes."

15   A.  "You get those absentee ballots from the elections

16   office.  You cannot take somewhere else.  You cannot take

17   them anywhere else except the elections office."

18   Q.  "Who did you get them from to bring them to the election

19   office?"

20   A.  "Yeah, from the voters.  So you can only be an agent for

21   three individuals, so.  And you can take three sealed

22   envelopes at a time.  You cannot take more than three."

23   Q.  "Mr. Mohamed, these people said that they did not give

24   you their ballot.  So what I'm asking you is, where did you

25   get the ballots that you turned in?"

1    A.  "They may not know me personally, you know.  So I've

2    done, like I said before, thousands of door knocking, so.  I

3    don't remember.  I don't -- I don't expect them to know me,

4    you know, individually, but I dealt with a number of people,

5    so I don't think they can remember who -- who I was."

6    Q.  "Mr. Mohamed, not only do these people not know you,

7    they did not request an agent to deliver one of their

8    ballots.  So where did you get the ballots that you

9    delivered?"

10   A.  "You know, it's possible that I -- they don't remember

11   me.  I don't remember them individually.  They may not know

12   me personally.  But this is what I know.  I took those three

13   sealed envelopes to the elections office, I acted as an

14   agent for these individuals, and I took those three

15   envelopes to the elections office.  You can only take three

16   at any given time.  You cannot take more than three."

17   Q.  "Okay.  Mr. Mohamed, who gave you the envelopes that you

18   took to the elections office?"

19   A.  "The person who just voted, the voter."

20   Q.  "Okay.  Mr. Mohamed, Nasro Jama did not give you a

21   ballot.  Who gave you Nasro Jama's ballot?"

22   A.  "You said Nasro did not give me the ballot, the absentee

23   ballot?"

24   Q.  "That is correct.  So where did you get this ballot

25   from?"

1  A.  "I get these absentee ballots from the voters.  Without

2  them giving me those absentee ballots, I could not have

3  filled out the agent log.  I wouldn't have signed it.  I

4  wouldn't have done it without them giving me their

5  permission.  So I wouldn't get ahold of those absentee

6  ballots without me being their agent and without dealing

7  with them.  How would I -- where would I get them?"

8  Q.  "That is what I'm asking you, sir.  Where did you get

9  these ballots?"

10  A.  "So after the voters filled out the absentee ballots,

11  after they had voted, I took those absentee ballots and

12  returned them back to the elections office."

13  Q.  Now, if we go over a few more pages to page 40, Special

14  Agent Hostetter, of Government's Exhibit 1, starting with

15  line 3, does the prosecutor ask one more time where these

16  envelopes came from?

17  A.  Yes, ma'am.

18  Q.  And prosecutor starts out, "Who gave you these envelopes

19  to take to the election office?"

20  A.  "The three sealed envelopes, I got them from the voters

21  themselves.  For the absentee ballot -- sorry, for the agent

22  log, I get that from the -- from Dawson in the office."

23  Q.  "And you understand that these three people have said

24  they did not give you their ballot?"

25  A.  "Okay.  So it's possible that these people may not know

1    me.  They may not be acquainted with me.  I was not

2    acquainted with them as well.  So it's possible that they

3    may not recognize me or recall who I was, but in any case I

4    got those three sealed envelopes from the voters themselves.

5    Took them to the elections office.  The process was followed

6    and the absentee" --

7    Q.  Sorry.  I cut you off there.  You need to finish with

8    line 18.

9    A.  -- "ballots were accepted.  That's what took place."

10   Q.  Okay.  And then continuing on over at page 43 of

11   Government's Exhibit 1, starting with line 6, is Mr. Mohamed

12   asked some questions about how he came to be an agent for

13   these three voters?

14   A.  Can you state that again, please?

15   Q.  There's some questions here about how he got to be these

16   voters' agent?

17   A.  Yes.

18   Q.  And at line 6 he says -- the prosecutor asks, "Did the

19   campaign office tell you which houses to go to?"

20   A.  "Yes.  They give me a list of the doors that you need to

21   knock on and --"

22   Q.  "Okay.  And once you got to the house, there would

23   sometimes be a voter, correct?"

24   A.  "The voter may, at that point, ask you to become their

25   agent, yes."

1   Q.  "Okay.  And is that what happened on these three

2   occasions that we're looking at here?"

3   A.  "All of them."

4   Q.  All right.  And then the last part of this transcript

5   that I want to review with you, Special Agent Hostetter, it

6   begins over at page 46.

7           You testified earlier that when a witness

8   testifies in the grand jury, sometimes the grand jurors

9   themselves will ask some questions; is that correct?

10  A.  Yes, ma'am.

11  Q.  Did there come a point in Muse Mohamed's October 14th,

12  2021, testimony when the grand jurors asked him some

13  questions?

14  A.  Yes.

15  Q.  Okay.  Let's take a look at that section.  And starting

16  from line 12, the prosecutor indicates she's going to let

17  the grand jurors ask questions if they'd like to; is that

18  correct?

19  A.  That's correct.

20  Q.  And then we see the foreperson recognizing someone in

21  the back.  And so now I will ask the questions on behalf of

22  the grand juror, and I will ask you to give Muse Mohamed's

23  answers.  Do you understand?

24  A.  Yes.

25  Q.  So down at the bottom of the page, the grand juror asks,

1   "Through the course of testimony, your body language

2   suggests that you're a little bit nervous.  Is that

3   accurate?"

4   A.  "No.  I have a hernia.  So if my hernia bothers me, I

5   need more water.  My hernia is very long, like this.  I

6   tried to get help at the hospital, but --"

7   Q.  "Aside from the water, I'm going to tell you that you've

8   been shaking and sweating.  Aside from all that, I want you

9   to know it's okay if you stand.  Okay?

10          "Sometimes innocent people may get caught up in

11  wrong things, right?  And you may be set up to do something

12  that you may have no knowledge of what you were doing.  And

13  that's okay if it happened."

14  A.  "Personally, if I ask myself, I am -- I am from an

15  affluent family, we are respected a lot, who never take a

16  ticket, even the lowest ticket, a parking ticket, never get

17  a ticket for more than 14, 15 years.  I'm that person who

18  follow on the who and the why."

19  Q.  And the grand juror asks, "So what happens in life,

20  sometimes people take advantage of those people, right?  So

21  some person wanting to commit a crime, they take advantage

22  of you."

23  A.  "It's possible."

24  Q.  "And that's what we are here for today and the previous

25  times, is to figure out if that's what's happening to you.

1    So it's easier if you are 100 percent honest.  We've heard

2    from a lot of people's testimony, and it's easier to get

3    this off your shoulders to sleep at night knowing that we've

4    heard from a lot of people.  Because I truly believe, like

5    you said, you're a good person."

6    A.  "Yes."

7    Q.  "So as a refresher, is it possible here on 8-11 that

8    maybe you got in too far and were taken -- let me ask you

9    this.  How did you get to the election -- how did you turn

10   in these ballots?  Did you drive?"

11   A.  It says, through the interpreter "Yes, I would drive

12   myself."

13   Q.  "You drove yourself.  So on your way there, is it

14   possible that someone maybe wanted to take advantage of a

15   nice person, that doesn't have any record, to commit a crime

16   and gave you 3,000 and said, hey, I know you're a good

17   person, they're probably not going to question this, so take

18   these three ballots for me and drop them off.  Is that

19   possible?"

20   A.  It says, through the interpreter, "That's not possible."

21   Q.  And the grand juror responds, "You're still going to

22   tell us it's possible that you still met these three people?

23   You're a good citizen and you didn't break any laws.  You're

24   for sure going to say that?"

25   A.  Through the interpreter, "Yes, that is my decision, that

1    I got them from the voters themselves.  I know they accept

2    these absentee ballots.  If these people voted already or if

3    they are slated to vote in person, it's possible.  Sometimes

4    people change their" mind -- "their answer."  Excuse me.

5    Q.  "But one thing that" -- oh, I'm sorry.  Mr. Mohamed

6    continues on; is that correct?

7    A.  He does.  Sorry.

8            "But one thing that happened to me, I would say on

9    December of last -- last December, a group of people took my

10   phone and my wallet and ID, my social security even, and

11   that was December of last year."

12   Q.  "I'm sorry to hear that."

13   A.  "But nothing -- but nothing -- I know there are people

14   that can be out on the street like that nowadays and they're

15   taking your cars and other things.  But other than that,

16   no."

17   Q.  And the grand juror asks, "Was the campaign office

18   afraid of losing?"

19   A.  Again, through the interpreter, "No.  No, I don't think

20   so.  You know, even though I was student, like I said, I was

21   not really involved."

22   Q.  The grand juror says, "Well, I disagree because you said

23   you went to thousands of doors.  So you were involved more

24   than what you're telling us today."

25   A.  Again, through the interpreter, "On my days off, twice

1    or three times a week, I will spend lots of time trying to

2    help them out, so."

3    Q.  And then the foreperson recognizes another grand juror

4    who down at line 16 asks, "Do you have a cash app or a

5    Vimeo?"

6    A.  "I do have a cash app, but not Vimeo."

7    Q.  The interpreter indicates that -- he spoke English and

8    he didn't quite get that.  And then the grand juror

9    continues on, "You said you do have a cash app?"

10   A.  Again, through the interpreter, "I am not -- yes, I have

11   a cash app.  I don't use it.  In the past I did use it once,

12   but nowadays I have it, but I don't use it a lot.  It's

13   just -- when I'm getting my haircut, when the guy do my

14   haircut, I use the cash app.  So I use it that way."

15   Q.  "And did you ever receive any cash or prizes for being

16   an agent?"

17   A.  "No, never.  Never."

18   Q.  "Okay.  Thank you."

19   A.  "Thank you so much."

20   Q.  The foreperson recognizes another grand juror to ask a

21   question, and the question continues from the grand juror.

22   "Sir, I contend that our lives are determined by a number of

23   decisions that we make every day."

24               THE INTERPRETER:  Your Honor, may I have a second?

25               THE COURT:  You may.  Just a minute.

1          And just to be clear, we're on page 51 of

2    Exhibit 1.

3          MS. SVENDSEN:  Thank you, Your Honor.

4          THE COURT:  Go ahead, Ms. Svendsen.

5          MS. SVENDSEN:  Thank you, Your Honor.

6    BY MS. SVENDSEN:

7    Q.  And so at line 14 the grand juror starts out, "Sir, I

8    contend that our lives are determined by a number of

9    decisions that we make every day, sometimes every hour,

10   sometimes every minute.  Most of us try to make the right

11   decision and we get to go on this path.  Sometimes --

12   sometimes unfortunately decisions are made and we go on this

13   path, and that's not a fun path.

14          "And I would ask you and tell you that you're

15   having a prime opportunity right now to determine the path

16   that you will be going.  Forget what we've talked about for

17   the last two hours.  In the next minute, make the right

18   decision."

19          And Mr. Mohamed responds on page 52.

20   A.  "Thank you so much.  Early in the morning I wake up

21   every day.  I pray at 4:00 in the morning.  I ask my -- my

22   God to give me strength.  Thank you."

23   Q.  And the grand juror says, "I have one -- one other

24   question.

25          "Your testimony was that you picked up the ballots

1    from those three people, the sealed envelopes to take them

2    in.  Did you check the photo ID of each of those people and

3    compare it to the name on the ballot?"

4    A.  Again, through the interpreter, "When you're filling out

5    the agent form, then you -- that's when you should check the

6    ID of the individuals that you are acting as their agent."

7    Q.  "So did you go to each of those people and you looked at

8    their ID and made sure that their picture looked like the

9    person that was handing you the sealed ballot; is that

10   correct?"

11   A.  "I don't remember doing that at the time when I was

12   taking those absentee ballots from them.  Typically you

13   would ask for the ID when you are acting -- when you're

14   acting as an agent for someone who is voting absentee.  But

15   in this particular situation, I don't remember asking them

16   for the ID."

17   Q.  And up at the top of page 53 the grand juror continues,

18   "So you don't remember if, when you picked up those three

19   ballots, if you looked at their IDs?"

20   A.  "I do not remember asking for their IDs."

21   Q.  And then the foreperson recognizes another grand juror

22   who at line 8 starts out, "Hi, Mr. Mohamed.  I need you to

23   help me with a quandary.  If each of these three people came

24   to us independently and told us that they never requested an

25   absentee ballot, nor did anyone come to their -- come to

1    them to pick up an absentee ballot, if they told us that,

2    and now we're hearing you tell us that you went to each of

3    them and picked up an absentee ballot, what should I think

4    about that?"

5    A.  "You're asking me how can I explain the discrepancies

6    there?"

7    Q.  "Yes.  What should I think of that?  Because they are at

8    odds with each other."

9    A.  "I don't know how I can explain it to you better, but

10   this is what I know.  When you receive those absentee

11   ballots from the voters themselves, you take them to the

12   elections office.  The election judge will inspect them.  If

13   they -- any discrepancies, if they already voted or if

14   they're scheduled to vote in person, then they will check

15   those absentee ballots.  They will not accept them if there

16   was any issues.  That's how I tell you."

17   Q.  "I understand that.  These people say they never gave an

18   absentee ballot to anyone.  You say they gave you their

19   absentee ballot."

20   A.  "The elections office will not accept those absentee

21   ballots without -- "

22   Q.  "Thank you."

23        "I've got one more for you.  You told us this

24   story in December.  So what he just asked you, should we go

25   find these three people and charge them with perjury?  You

1    are aware perjury has a penalty of up to one year in jail.

2    If on your account they committed perjury, should we do

3    that?"

4    A.  "I cannot speak for them.  Okay.  So I cannot speak to

5    what these people said, you know.  I'm not here to speak for

6    them, but I can tell you that -- I told you what I know

7    about this situation.

8            "In terms of what happened to me, the robbery and

9    all that, somebody held a gun to my head and took my wallet

10   and all of that.  They used my -- my card at an ATM machine

11   and nobody did anything about them."

12   Q.  And following that the witness is excused; is that

13   correct?

14   A.  That's correct.

15   Q.  All right.

16           THE COURT:  Can I just -- I'm going to interrupt

17   for one moment just because of the unusual nature of the

18   testimony.

19           It's clear to everyone in the courtroom how this

20   has gone, and you two have done a good job of separating

21   what is the agent's testimony from his reading of the

22   answers from Exhibits 1 and 4.  But just to make sure that

23   it is clear for the record, the portions of the testimony

24   from Special Agent Hostetter are Agent Hostetter reading

25   from Mr. Mohamed's answers in transcripts Exhibits 1 and 4

1    and Ms. Svendsen asking the questions that the prosecutor or

2    the grand jurors asked.

3              Thank you.

4              MS. SVENDSEN:  Thank you, Your Honor.

5    BY MS. SVENDSEN:

6    Q.  I want to talk to you about two additional exhibits,

7    Special Agent Hostetter.  You're aware that Muse Mohamed is

8    charged with two counts of making false statements to the

9    grand jury; is that correct?

10   A.  Yes, ma'am.

11   Q.  During which session of his grand jury testimony did he

12   make those two false statements?

13   A.  The second session, October 14th, 2021.

14   Q.  Okay.  Now, are there some exhibits in evidence that can

15   aid the jury in finding and zeroing in on those actual

16   charged false statements?

17   A.  Yes, ma'am.

18   Q.  And if we start with what's already been admitted into

19   evidence as Government's Exhibit 2, we will scroll through

20   the pages of it, but what is Government's Exhibit 2?

21   A.  It's the exhibit that just kind of breaks out Count 1 of

22   the indictment.

23   Q.  Okay.  So the cover page, page 1 of Government

24   Exhibit 2, what does that contain?

25   A.  It's the first page of the transcript from October 14th,

1    2021.

2    Q.  And if we go over to page 2 of Government's Exhibit 2,

3    what's right up at the top of it?

4    A.  The date and time.

5    Q.  And right below that?

6    A.  It indicates the translator being sworn in and then

7    Mr. Mohamed also being sworn.

8    Q.  And so it shows that at this time on October 14th Muse

9    Mohamed is testifying under oath?

10   A.  That's correct.

11   Q.  And then the next couple of pages that are in here,

12   starting down at the bottom of page 2 and then continuing

13   over to page 3, what information is contained in those

14   pages?

15   A.  He's being informed of his rights.

16   Q.  And if we go over to page 4 of Government's Exhibit 2,

17   do those rights continue?

18   A.  Yes.

19   Q.  Okay.  Let's take a look at page 5 of Government's

20   Exhibit 2.  It's marked page 29 up here in the top right

21   corner, but it's page 5 of this exhibit; is that right?

22   A.  That's correct.

23   Q.  Why is that?

24   A.  Because it's just breaking out the actual lie that was

25   told during grand jury and highlighting that for the jury.

1    Q.  And so this is page 29 of that bigger exhibit?

2    A.  Yes.

3    Q.  Government Exhibit 1?

4    A.  Correct.

5    Q.  And what's in the box?

6    A.  The statement that mister -- the false statement that

7    Mr. Mohamed gave.

8            MR. CLIPPERT:  Object to the characterization of

9    the statement as false.

10           THE COURT:  It's the charge statement.  Can you

11   rephrase, please?

12           THE WITNESS:  It's the statement given on

13   October 14th.

14   BY MS. SVENDSEN:

15   Q.  That's charged in Count 1?

16   A.  Correct.

17   Q.  Okay.  Now, over at Government's Exhibit 3, is this a

18   similar kind of exhibit?

19   A.  Yes, ma'am.

20   Q.  What is it?

21   A.  It's breaking out Count 2 of the indictment.

22   Q.  And so on the front cover we have what again?

23   A.  It is the front page of the transcript from

24   October 14th.

25   Q.  And then what's up at the top of page 2 of Government's

1    Exhibit 3, for the jury's purposes?

2    A.  It's the date and time stamp.  Thursday, October 14,

3    2021, at 9:25 a.m.  And then it says, Whereupon, Osman

4    Abdulle was sworn as the Somali interpreter, and then it

5    continues on and indicates that Mr. Mohamed was also duly

6    sworn, taking the oath.

7    Q.  And these are the same front pages as the other exhibit

8    had?

9    A.  Yes, ma'am.

10   Q.  Continuing through the rights?

11   A.  Yes.

12   Q.  And then if we go over to page 5 of Government's

13   Exhibit 3, it says page 31 up in the top right corner.  Why

14   is that?

15   A.  Because it's the page from the overall transcript

16   indicating the second count of what he's charged with.

17   Q.  And so this page 31 is page 31 of that bigger exhibit,

18   Government's Exhibit 1?

19   A.  Yes, ma'am.

20   Q.  And then within the box we've got the charge statements

21   from Count 2; is that correct?

22   A.  That's correct.

23   Q.  All right.  And just one more time.  If we go to page 5

24   of Government's Exhibit 2, the charge statements there,

25   beginning with line 11, could you provide that one more time

1    for the jury?

2    A.  From line 11?

3            MR. CLIPPERT:  It's cumulative at this stage.

4            THE COURT:  Overruled.  You may answer.

5            THE WITNESS:  I'm sorry.  You said line 11?

6    BY MS. SVENDSEN:

7    Q.  Yeah, starting from line 11.

8    A.  "Okay.  So I got three absentee ballots from the

9    elections office.  I took -- I took those ballots to the

10   voters, they filled them out, they voted, and then I took

11   them back and turned those -- I turned those absentee

12   ballots back to the election office."

13   Q.  And just to make sure it's clear, the statements that

14   we're talking about in this case, I'm going to show you

15   page 5 of Government's Exhibit 3 and walk through with you

16   the box there, starting with line 3.

17           "I am talking about if you picked up an absentee

18   ballot and brought it to Nasro Jama.  Did you do that?"

19   A.  "I got the absentee ballot from the elections office and

20   took it to Nasro Jama."

21   Q.  "So you're saying that you picked up a blank absentee

22   ballot from the election office and you brought that

23   directly to Nasro Jama?"

24   A.  "You know, from what I remember, if my memory is

25   correct, I remember Nasro Jama was the one who filled out

1    the absentee ballots -- or the absentee ballot, sealed it

2    up, and then told me to drop it off for her."

3    Q.  Now, at the beginning of your testimony, you testified

4    that the grand jury in this case was attempting to determine

5    whether ballots were turned in without the voters'

6    knowledge; is that correct?

7    A.  That is correct.

8    Q.  Was it important to the investigation to determine

9    whether Muse Mohamed actually took these three ballots to

10   the voters to vote them?

11   A.  It was.

12   Q.  Why?

13   A.  Because we wanted to know if the ballots [sic] had given

14   permission to turn in ballots on their behalf.

15   Q.  And if they had not, what were you trying to determine

16   at that point?

17   A.  Who filled out the ballots and directed people to turn

18   them in.

19          MS. SVENDSEN:  If I could just have a moment, Your

20   Honor?

21          THE COURT:  You may.

22          MS. SVENDSEN:  Nothing further, Your Honor.

23          THE COURT:  We're going to take our morning break

24   at this time.  So we'll come back at 10:35.  Thank you.

25          All rise for the jury.

1    (Recess taken at 10:18 a.m. till 10:37 a.m.)

2                        **IN OPEN COURT**

3                        **(JURY PRESENT)**

4         THE COURT:  Mr. Clippert, cross-examination.

5         MR. CLIPPERT:  Yes, Your Honor.

6                    <u>CROSS-EXAMINATION</u>

7    BY MR. CLIPPERT:

8    Q.  I've just got a few follow-up questions about grand

9    juries in general and then maybe a few about this one.

10            If someone gets called in to serve as a grand

11   juror, how long can that service last?

12   A.  I'm not sure on the total length.

13   Q.  Is it months?

14   A.  It's a year plus, if it's extended, yes.

15   Q.  Okay.  Can the grand jury hear only one case at a time?

16   A.  No.

17   Q.  So prosecutors present maybe a few cases to that same

18   grand jury over the term of their service, right?

19   A.  That's my understanding, yes.

20   Q.  Okay.  And in this case you testified that the grand

21   jury heard Mr. Mohamed's testimony on September 30th and

22   October 14th.  Do you know whether the grand jury was

23   hearing evidence related to this investigation that whole

24   two-week time in between?

25   A.  I don't -- they usually only were convened on Thursdays,

1    so I would assume they heard other evidence for various

2    investigations while they were convened, yes.

3    Q.   Okay.  But I guess that's -- you answered my question

4    and I want to make sure.  So the grand jury doesn't meet

5    Monday through Friday every day of the week to hear

6    evidence?

7    A.   Not typically, no.

8    Q.   Okay.  So in this time period the grand juries were only

9    convening on Thursday; is that right?

10   A.   I believe so, yes.

11   Q.   Okay.  In terms of this investigation, I'm not -- and if

12   I'm asking you something I shouldn't, you can tell me that.

13   But how long did this grand jury investigation go on, just

14   generally?

15   A.   It actually started I believe before I was put on the

16   case.  So I can't answer that in an overall, but at least a

17   year it was looking into the matter.

18   Q.   Okay.  And was that a year from -- because that's when

19   you started, was it a year on this case?

20   A.   No.  Total it was at least a year.

21   Q.   Okay.  Do you know how many witnesses were presented to

22   the grand jury?

23   A.   A lot.  Closing in on probably 80.

24   Q.   80.  Okay.

25           MR. CLIPPERT:  Nothing further, Your Honor.

1          THE COURT:  Ms. Svendsen?

2          MS. SVENDSEN:  Nothing further, Your Honor.  Thank

3    you.

4          THE COURT:  You may step down, sir.  Thank you.

5          And the government may call its next witness.

6          MS. MUNOZ:  Your Honor, the government rests.

7          THE COURT:  Thank you.

8          Members of the jury, I'm going to give you another

9    break so that we may take up some legal issues, and then

10   we'll keep you posted, and we'll try to keep your time as

11   efficient as possible.

12         All rise for the jury.

13   10:40 a.m.

14                      **IN OPEN COURT**

15                    **(JURY NOT PRESENT)**

16         THE COURT:  You may all be seated.

17         And, Mr. Clippert, what is the defense intention?

18         MR. CLIPPERT:  I have a witness that I just don't

19   think he can add much, so I don't think I'm going to call

20   him.

21         Mr. Mohamed, have you -- you and I talked about

22   your right to testify.  Do you understand what that means?

23         THE DEFENDANT:  Yes.

24         MR. CLIPPERT:  Do you understand it's your right

25   and not my right?  Do you understand that?

1           THE DEFENDANT:  Yes.

2           MR. CLIPPERT:  I mean, I can give you my advice.

3           COURT REPORTER:  Excuse me.  Can you speak into

4    the microphones, please?

5           THE COURT:  And you may be seated for this.  Thank

6    you, Mr. Clippert.

7           MR. CLIPPERT:  I apologize.

8           It's your right to testify and not mine.  So I can

9    give you advice.

10          THE DEFENDANT:  Yes.

11          MR. CLIPPERT:  But it's your decision.  Do you

12   understand that?

13          THE DEFENDANT:  Yes.

14          MR. CLIPPERT:  And if you choose not to testify,

15   there's going to be several places in the jury instructions

16   where the judge will say, on the bottom of page 6, The fact

17   that Mr. Mohamed did not testify must not be considered by

18   you in any way or even discussed in arriving at your

19   verdict.  So the judge is going to instruct the jury that

20   they cannot consider your silence in any way.  Do you

21   understand that?

22          THE DEFENDANT:  Yes.

23          MR. CLIPPERT:  Having thought this matter through,

24   have you made a decision about whether you want to testify?

25          THE DEFENDANT:  Yes.  I testified before, and I

1    tell the truth.

2                    MR. CLIPPERT:  Okay.  So --

3                    THE COURT:  Wait, wait, wait.  I need his answer.

4                    MR. CLIPPERT:  Oh, sorry.

5                    THE COURT:  I understand that it was in English,

6    but I need it from the interpreter.

7                    THE DEFENDANT:  I testified before, and I tell the

8    truth.

9                    MR. CLIPPERT:  But, Mr. Mohamed, what I am wanting

10   to know is whether you want to testify here today.

11                   THE DEFENDANT:  If they ask me, I can, yeah.

12                   THE INTERPRETER:  I did not hear that myself.

13                   THE COURT:  Okay.  Mr. Mohamed, the decision on

14   whether to testify is yours and yours alone.  You have the

15   right to take the stand here and testify before this jury.

16   You equally have the right not to testify.  So you have the

17   right to stay silent and no one can use that against you.

18                   THE DEFENDANT:  Okay.  Okay.

19                   THE COURT:  Do you have any questions about that

20   right?

21                   THE DEFENDANT:  No, no.

22                   THE COURT:  And, again, this is not Mr. Clippert's

23   decision.  This is yours and yours alone.

24                   THE DEFENDANT:  Okay.

25                   THE COURT:  What do you wish to do?  Do you wish

1    to testify or not testify?

2              THE DEFENDANT:  I will stay silent.

3              THE COURT:  All right.  Do you have any questions

4    about your right to testify?

5              THE DEFENDANT:  No.

6              THE COURT:  Do you need any more time to speak

7    with Mr. Clippert about that right?

8              THE DEFENDANT:  I think I'm fine.

9              THE COURT:  Did you say, "I think I'm fine."

10             THE DEFENDANT:  Yeah.

11             THE COURT:  Okay.  Are you sure?

12             MR. CLIPPERT:  Could I just have a quick --

13             THE COURT:  Of course.

14             MR. CLIPPERT:  -- chat with him?

15             THE COURT:  Yes.

16             MR. CLIPPERT:  Go back to the conference room?

17             THE COURT:  Sure.  We'll take a break, and I'll

18   just -- I'll give you 15 minutes, and we'll come back at 11.

19   And then let's also just in case be prepared to talk about

20   the schedule going forward.  All right.  Thanks.

21             COURTROOM DEPUTY:  All rise.

22             (Recess taken at 10:45 a.m. till 11 a.m.)

23             THE COURT:  You may all be seated.

24             Mr. Mohamed, we took a break so that you could

25   talk with Mr. Clippert about your decision whether to

1    testify.  Just know that I don't have a view as to what you

2    should do.  What is your decision, sir?

3                THE INTERPRETER:  I'm not hearing, Your Honor.

4                THE DEFENDANT (through interpreter):  Yeah, I will

5    remain silent.  I will not testify.

6                THE COURT:  And do you have a clear head today?

7                THE DEFENDANT (through interpreter):  Very much.

8    Good.

9                THE COURT:  All right.  Thank you.

10               Anything from the government to add?

11               MS. MUNOZ:  No, Your Honor.  Thank you.

12               THE COURT:  All right.  And any motions that need

13   to be made at this time from the government or the defense?

14               MS. MUNOZ:  None from the government, Your Honor.

15               MR. CLIPPERT:  Your Honor, we haven't officially

16   rested.

17               I'm assuming based on the court's prior ruling

18   that the court would not allow Mr. Jaylani to testify, but I

19   probably should have a ruling on that, if I could.

20               THE COURT:  Do you continue to persist in wanting

21   him to testify?

22               MR. CLIPPERT:  I would.

23               THE COURT:  Okay.  And so explain -- so part of

24   the reason for my deferring that ruling was to determine

25   whether any bias had been exhibited by any of the defendants

1    such that Mr. Jaylani's testimony would be relevant.  What

2    is your argument there?

3           MR. CLIPPERT:  Your Honor, I think the -- I think

4    Ms. Nasro Jama's testimony opened that door.  I know she

5    said she wasn't scared, but she was clearly felt harassed, I

6    would say, by the situation.  She was not happy to be here.

7    And I think that would also be consistent with Mr. Jaylani's

8    testimony, that there's a feeling of harassment within the

9    Somali community by the FBI.

10          THE COURT:  And assuming for the moment that she

11   exhibited feelings of being harassed, how does that go to

12   bias in her testimony?

13          MR. CLIPPERT:  And, Your Honor, that -- I think it

14   shows that she's had, she's had to say one thing and be

15   consistent the whole time and she's not happy about it.

16          THE COURT:  Thank you.

17          Response from the government.

18          MS. SVENDSEN:  Your Honor, I'm not sure how it

19   could be any clearer that Ms. Jama was not intimidated by

20   the government into testifying any particular way.  Whether

21   she was or wasn't unhappy to be here doesn't reflect on the

22   veracity of her testimony, which is what the jury is here to

23   evaluate.  And because there's no foundation for any belief

24   that Ms. Jama testified the way she did because she was

25   afraid or intimidated by the government, when she clearly

1    was not, there's no basis for Mr. Hussein's testimony.

2            THE COURT:  The witness at issue, Ms. Jama, was

3    clearly not intimidated by anyone, including the court, and

4    I say that because of her appearance on the witness stand

5    and her words, as well as her body language.  And it was

6    clear she was not happy to be here, but I didn't see

7    anything that indicated that she was biased in any way to

8    testify one way or another.  And because of that, I am

9    denying the motion in limine to allow the testimony of the

10   defense witness, one moment, and that is Jaylani Hussein,

11   who was also the subject of the motion in limine that the

12   court made a preliminary ruling, but decided to defer.

13           All right.  With respect to the defense case, is

14   it then your intent to rest, Mr. Clippert?

15           MR. CLIPPERT:  Yes, Your Honor.

16           THE COURT:  All right.  So I'll call the jury in

17   for that purpose.  We'll give them another break that will

18   include their lunch break.  We can go over jury instructions

19   at that time so that you all during your lunch break can

20   prepare for closings, and I will prepare the jury

21   instructions with any changes that need to be made.  Okay?

22           Let's go get the jury.

23   11:07 a.m.

24                        **IN OPEN COURT**

25                        **(JURY PRESENT)**

1          THE COURT:  You may all be seated.

2          Mr. Clippert.

3          MR. CLIPPERT:  And, Your Honor, the defense rests.

4          THE COURT:  Thank you.

5          At this time we are going to let you go for an

6    extended lunch break, while we take up some other legal

7    matters, and then you will come back and there will be final

8    instructions and closings this afternoon.  So I'm going to

9    have you all come back at 1:00.  All right.  Thanks,

10   everyone.

11         All rise for the jury.

12   11:09 a.m.

13                         **IN OPEN COURT**

14                      **(JURY NOT PRESENT)**

15         THE COURT:  You may all be seated.

16         Let's just be off the record for a moment for a

17   discussion on jury instructions, and we can put anything on

18   the record that we need to after that.  So sort of given the

19   brevity of the instructions and informal charge conference.

20   Does that make sense, counsel?

21         MS. MUNOZ:  Yes, Your Honor.

22         THE COURT:  Mr. Clippert?

23         MR. CLIPPERT:  Yes, Your Honor.

24         THE COURT:  All right.  So we're off the record.

25                      (Off the record)

1          THE COURT:  We've had a brief charge conference

2     about the final jury instructions, and there was one

3     objection from Mr. Clippert that I overruled.

4          Mr. Clippert, would you state that objection,

5     please?

6          MR. CLIPPERT:  Yes, Your Honor.

7          It's in Jury Instructions 6 and 7.  The

8     instruction says, You need not find that all of the alleged

9     statements in each count of the indictment are false;

10    instead, you must find unanimously and beyond a reasonable

11    doubt that at least one of the statements set out in a

12    particular count of the indictment is false.  And I would

13    object to that because it would allow for a nonunanimous

14    verdict.  Jurors could agree on half of a statement and six

15    could agree on the other half.

16         And I had read *Holley* as actually supporting this

17    argument, and we had a discussion about that.  And I can get

18    a cite for *Holley*, I don't have it off the top of my head,

19    but it is one of the cases noted in the pattern jury

20    instructions as well.

21         THE COURT:  Thank you.

22         Ms. Svendsen, could you state the government's

23    position, please?

24         MS. SVENDSEN:  Thank you, Your Honor.

25         The government cites the notes on use to the

1    Instruction 6, 18 1623, which recommends that this language

2    be used in a case that has facts like this one where the

3    charged false statements have multiple parts.  The notes on

4    use cite to the *Holley* case from the Fifth Circuit, it's at

5    942 F.2d 916, in support of the use of this language.

6            In the *Holley* case the defendant was charged under

7    1623 with making false statements, and the court gave only

8    the elements of the offense in the instructions and didn't

9    make any reference to a unanimity requirement, and the

10   verdict in that case was reversed, and so -- you know, it

11   explicitly is a unanimity instruction that requires the jury

12   to find unanimously one particular false statement.

13           THE COURT:  I agree that it is a unanimity

14   instruction and that it is necessary to give it here because

15   the statements from the grand jury in each charge -- there

16   are more than one, and it tells the jury explicitly that

17   they must find unanimously and beyond a reasonable doubt

18   that at least one of the statements set out in a particular

19   count is false.  So I am overruling the objection and giving

20   the instruction.

21           And other than that, does the government have any

22   objections on the record to the final jury instructions?

23           MS. MUNOZ:  Your Honor, the only other thing that

24   we noted on the -- at the charge conference was the removal

25   of Instruction Number 10, because our demonstrative was

1    admitted, but no other objections.

2              THE COURT:  Thank you.

3              And, Mr. Clippert, any other objections noted?

4              MR. CLIPPERT:  None, Your Honor.

5              THE COURT:  Thank you.  We'll go off the record.

6              (Recess taken at 11:18 a.m. till 1:05 p.m.)

7                          **IN OPEN COURT**

8                          **(JURY PRESENT)**

9              THE COURT:  You may all be seated.

10             Members of the jury, the time has come for the

11   lawyers to have the opportunity to present closing arguments

12   to you.  I will ask each of them to do so, and then I will

13   give you final instructions on the law.

14             Ms. Svendsen.

15             MS. SVENDSEN:  Good afternoon.  May it please the

16   court.  Counsel.  Members of the jury.

17             Muse Mohamed lied to the grand jury.  He went to

18   the federal courthouse in St. Paul, went to the grand jury

19   room, got on a witness stand just like this one, raised his

20   right hand, and he took an oath promising to tell the truth.

21   But instead of telling the grand jury the truth, Muse

22   Mohamed chose to lie to them about something that went to

23   the very heart of the grand jury's investigation.

24             As you learned during this trial, the grand jury

25   was investigating whether people in Minneapolis had ballots

dropped off without their knowledge in connection with the
August 11th, 2020, primary election and, if so, who filled
out those ballots.  And as you've heard loud and clear
during this trial, Muse Mohamed turned in ballots for people
who didn't know about it.

Instead of telling the grand jury the truth about
where he got those ballots, information that could have
helped move forward their investigation about who filled
them out, Muse Mohamed lied.  He falsely claimed that he
took those ballots from the election office to the voters,
that the voters filled them out.  He lied on September 30th,
2021, during his first round of grand jury testimony, and he
lied again when he was given an opportunity to come back two
weeks later on October 14th and come clean.  Simply put, he
didn't want to tell the grand jury where he got those
ballots, and so he lied.

Lying under oath to the grand jury is a crime.
And the evidence that you've heard in this trial proves
beyond a reasonable doubt that Muse Mohamed is guilty of
both counts of making false declarations before the grand
jury with which he's charged in this case.

Now, at the beginning of the trial my colleague
Ms. Munoz told you that making a false declaration before
the grand jury is a long phrase for a simple concept.
Lying.  And that's true.

1       In this case Muse Mohamed is charged in two counts

2   with two specific lies that he told the grand jury.  You've

3   heard those two lies read out a few times in the courtroom,

4   and we'll go through them again in a couple of minutes.  But

5   as Special Agent Hostetter told you, there are two exhibits

6   that you will have with you in the jury room that will make

7   it easy for you to find those two charged false statements.

8   Government's Exhibit 2 shows the false statement for Count 1

9   in a box, and Government's Exhibit 3 has the charged false

10  statement for Count 2 in a box.

11      So what does the government have to prove in order

12  for you to find Muse Mohamed guilty in this case?  The crime

13  of making a false declaration to the grand jury has four

14  elements, four things that the government has to prove

15  beyond a reasonable doubt in order for you to find Muse

16  Mohamed guilty.  And I'm going to take a few minutes this

17  afternoon to explain what those elements are and how the

18  evidence you've heard in this trial proves them beyond a

19  reasonable doubt.

20      So the first element is that the defendant

21  testified under oath or affirmation before a grand jury;

22  second, such testimony was false in whole or in part; third,

23  that at the time he so testified the defendant knew his

24  testimony was false; and the fourth element is that the

25  false testimony was material.  So let's walk through each of

1     those one by one.

2              First, the defendant testified under oath or

3     affirmation before a grand jury.  How do you know that Muse

4     Mohamed testified under oath?  You've got the transcript of

5     Muse Mohamed's October 14th testimony, Government's

6     Exhibit 1.  And at the very beginning it says that Muse

7     Mohamud Mohamed was called as a witness, having been duly

8     sworn by the foreperson of the grand jury.  Special Agent

9     Hostetter told you that he's testified before the grand jury

10    too and being "duly sworn" means taking that same oath that

11    you heard all of the witnesses take when they got on the

12    stand in this case, and it means swearing to tell the truth.

13             Now, shortly Judge Brasel is going to give you

14    your final instructions in this case, and you will hear that

15    for each of the two counts the first element requires that

16    the government prove the defendant testified under oath and

17    made a particular statement.  So for Count 1 that statement

18    is, where Muse Mohamed testified, "I got three absentee

19    ballots from the elections office.  I took -- I took those

20    ballots to the voters, they filled them out, they voted, and

21    then I took them back and turned those -- I turned those

22    absentee ballots back to the election office."

23             How do you know that Muse Mohamed actually made

24    that statement to the grand jury?  You can find it in the

25    full transcript of Mr. Mohamed's testimony on October 14th,

1     2021.  That's Government's Exhibit 1.  It's at page 29 of

2     Government's Exhibit 1.  And then you've also got it broken

3     out for you in Government's Exhibit 2, which Special Agent

4     Hostetter explained has just the cover page, the oath, and

5     then the explanation of Mr. Mohamed's rights and the page

6     containing his statements that were charged in Count 1

7     marked in a box.

8          For Count 2 the first element is that the

9     defendant testified under oath that "I got the absentee

10    ballot from the elections office and took it to Nasro Jama"

11    and "I remember Nasro Jama was the one who filled out the

12    absentee ballot, sealed it up, and then told me to drop it

13    off for her."  So just like Count 1, you can find these

14    statements in the full transcript of Muse Mohamed's

15    October 14th testimony on page 31 of Government's Exhibit 1,

16    but they're also broken out for you in Government's

17    Exhibit 3, which just the same way has that cover page, the

18    oath, the rights and then in a box the charged language.

19         How do you know the transcript accurately reflects

20    what Mr. Mohamed said on October 14th?  Because he signed a

21    document called a Stipulation in which he agreed at

22    Government's Exhibit 23 that the transcripts of his

23    testimony before the grand jury are complete and accurate.

24    So Muse Mohamed testified under oath before the grand jury

25    to each of the two statements with which he's charged, and

1    the first element is proven beyond a reasonable doubt.

2         Let's talk about the second element.  The second

3    element requires the government to prove that the testimony

4    was false in whole or in part.  So what does that mean?  As

5    I told you before, you will be receiving final instructions

6    from Judge Brasel shortly and one of those will tell you,

7    You need not find that all of the alleged false statements

8    in each count of the indictment are false; instead, you must

9    find unanimously and beyond a reasonable doubt that at least

10   one of the statements set forth in a particular count of the

11   indictment is false.

12        Okay.  Now, the lies that Muse Mohamed told in the

13   grand jury relate to the agent delivery process for absentee

14   ballots.  And you heard about that agent delivery process

15   from Jon Martin yesterday.  He was the first witness who

16   testified.  Before we talk about what those lies were, I

17   want to take just a minute to review the steps of the agent

18   delivery process when its done properly.

19        You learned during this trial that the two

20   important people in the agent delivery process are the voter

21   and the agent and that the voter initiates the agent

22   delivery process by asking the agent to pick up a ballot and

23   drop it off at the election office for him or her.  You

24   heard that a person is allowed to act as an agent for up to

25   three voters in any given election.

1          So the voter starts the process by giving the

2    agent a couple of different papers.  One is that Request for

3    Agent Delivery form that explains the reason the voter needs

4    a ballot to be picked up and dropped off for them, like if

5    the voter is in the hospital or in a nursing home or if the

6    voter has an incapacitating health reason and they can't get

7    to the polls.  And the other paper is the Absentee Ballot

8    Application.

9          The next step is that the agent delivers those two

10   forms to the election office, picks up the absentee ballot,

11   and brings the ballot back to the voter.  The voter fills

12   out the ballot, and then the agent delivers the ballot to

13   the election office, and it's logged on the agent return

14   log.

15         So with that process in mind, what did Muse

16   Mohamed lie about?  In Count 1 he basically told the grand

17   jury that he followed that agent delivery process to a T.

18   "I got three absentee ballots from the elections office.  I

19   took those ballots to the voters, they filled them out, they

20   voted, I took them back and turned those absentee ballots

21   back to the election office."  The problem is you've heard

22   from multiple witnesses in this case that that just wasn't

23   true.

24         You heard from Abdiriman Muse.  He was that

25   22-year-old computer scientist you heard from who testified

1    that he's about to finish his master's degree.  And he

2    talked about how his name and his address were misspelled on

3    all of the documents related to him.  Like on Government's

4    Exhibit 6, the Absentee Ballot Agent Return Log, his name

5    was spelled Abdirahman, with an A-H instead of an I, his

6    street name was misspelled, and his apartment number was

7    wrong.

8         On the Request for Agent Delivery of Absentee

9    Ballot at Government's Exhibit 10 his name was misspelled

10   again, but this time a different way, with an A instead of

11   an I.

12        And on the Absentee Ballot Application form that

13   the voter is supposed to fill out his name is misspelled

14   again.  His street name is misspelled again; this time a

15   different way.  And his apartment number is wrong again.

16   His phone number is listed as the phone number at his mom's

17   house, a place that he hasn't lived at in years.

18        Those documents are consistent with Abdiriman

19   Muse's testimony that he didn't ask Muse Mohamed to act as

20   his agent; and not only that, but he didn't ask anyone to

21   act as his agent.  He didn't fill out an Absentee Ballot

22   Application.  And he didn't even vote at all in the

23   August 2020 primary election.  So it simply isn't true that

24   Muse Mohamed took a ballot to him and that Abdiriman filled

25   it out.  And you also know that because Muse Mohamed never

1    turned back in a ballot for Abdiriman Muse.

2         Now, you also heard from Nasro Jama yesterday.

3    And she sat on the stand up there and testified through an

4    interpreter that she doesn't know Muse Mohamed, that she

5    didn't ask Muse Mohamed to pick up a ballot for her and that

6    when she votes she votes in person.  And Nasro Jama's

7    testimony that she votes in person was consistent with the

8    signature envelope that Muse Mohamed turned in for her with

9    a ballot, which showed that the absentee ballot Muse Mohamed

10   tried to turn in for her was rejected because she had

11   already voted.  That's at Government's Exhibit 9.

12        You also heard from Mustafa Hassan, who's been

13   friends with Muse Mohamed since high school and whose name

14   was listed as a witness on Nasro Jama's ballot.  And

15   Mr. Hassan told you two different kinds of things that are

16   important in this case.  When it comes to Nasro Jama's

17   specific ballot, Mustafa Hassan never signed as a witness.

18   And just like with Abdiriman Muse's documents, Mustafa

19   Hassan's address has errors in it.  That's because he didn't

20   write it.  In fact, he doesn't know Nasro Jama, and he

21   didn't go with Muse Mohamed to Nasro Jama's house.  So it's

22   just not true that Muse Mohamed took a ballot to Nasro Jama

23   and she filled it out and voted.

24        The other important category of information that

25   Mustafa Hassan gave you was about what he did do on the day

1    of the primary, August 11, 2020.  Mustafa Hassan volunteered

2    for the campaign for one day, that day, the day of the

3    primary election, August 11th, and he did that because his

4    friend Muse Mohamed asked him to.  And he told you on the

5    stand that when he showed up at the campaign headquarters

6    that day to volunteer Muse Mohamed was there.  Mustafa

7    Hassan was taken to a back room and given three envelopes by

8    someone at the campaign headquarters, and he was told to go

9    drop them off at the election office, so he drove there and

10   dropped them off.  That is what was happening at the

11   campaign headquarters on the day of the primary election.

12        Mustafa Hassan admitted to you that he didn't know

13   any of the voters whose three ballots he dropped off.  He

14   didn't meet any of them, he didn't get ballots from any of

15   them, just the same way that he didn't go to Nasro Jama's

16   house with Muse Mohamed and he didn't witness Nasro Jama

17   voting her ballot.

18        Now, Count 2 is similar, but it's specific just to

19   Nasro Jama.  So Muse Mohamed testified that "I got the

20   absentee ballot from the elections office and took it to

21   Nasro Jama.  Nasro Jama was the one who filled out the

22   absentee ballot, sealed it up, and then told me to drop it

23   off for her."

24        We've just gone through Nasro Jama's testimony

25   from yesterday, and so you know why these statements aren't

true.  I'm not going to go back through it again.  But is there anyone who heard Nasro Jama testify up here on the stand yesterday who believes for a second that Muse Mohamed took a ballot to her or that Ms. Jama then filled out that ballot and asked Muse Mohamed to turn it in for her?  Of course, she didn't.  Muse Mohamed lied.

He lied to the grand jury when he made the statements charged in both Count 1 and Count 2, and the second element is proven beyond a reasonable doubt.

The third element is that the time he so testified the defendant knew his testimony was false.  Now, when Judge Brasel provides you with your instructions in a little while, I expect you will hear that intent or knowledge may be proved like anything else.  You may consider any statements made and acts done by Mr. Mohamed and all the facts and circumstances in evidence which may aid in a determination of Mr. Mohamed's knowledge or intent.  You may, but are not required to, infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.  That's a long way of saying that you don't have to get into Muse Mohamed's head in order to figure out if he knew the things he said were false.  You can look at all of the facts and circumstances that you heard about during this trial.

So how do you know that Muse Mohamed knew his

1    testimony was false?  The first reason is obvious.  He

2    claimed he did a whole laundry list of things that he didn't

3    do.  He didn't take ballots to the voters.  Nasro Jama and

4    Abdiriman Muse told you that.  He never met these voters.

5    They didn't vote the ballots and give them to Muse Mohamed.

6    He didn't take those ballots from the voters and turn them

7    back in.  As to Count 2, he didn't take a ballot to Nasro

8    Jama.  Nasro Jama didn't ask him to turn in a ballot for

9    her.  These were bald-face lies, and Muse Mohamed knew good

10   and well that he didn't do those things.

11           In addition to the fact that these were obvious

12   lies, Muse Mohamed wasn't put on the spot with these

13   questions.  He wasn't taken by surprise, and he didn't

14   misunderstand them.  After he lied to the grand jury on

15   September 30th of 2021, he was given a second chance to come

16   in and set the record straight.  He knew exactly what he was

17   going to be asked, and he knew exactly what the grand jury

18   was investigating, and he chose to lie anyway.

19           I'd invite you to take a look at the transcripts

20   of both of his sessions of testimony before the grand jury;

21   and if you do that, you will see that Muse Mohamed chose to

22   lie about where he got these ballots over and over and over

23   again.  He lied about where he got these ballots dozens and

24   dozens of times.

25           Muse Mohamed knew that the testimony he was giving

1    was false, and the third element is proven beyond a

2    reasonable doubt.

3         Which brings us to the last element, which is that

4    the false testimony was material.  When Judge Brasel

5    instructs you in a few minutes, I expect you will hear that

6    false testimony is material if the testimony was capable of

7    influencing the grand jury.  It is not necessary to find

8    that the false testimony actually affected the grand jury.

9         So you've heard in this case that this testimony

10   went to the very heart of the grand jury's investigation in

11   this case.  Special Agent Hostetter told you that the grand

12   jury was focused on finding out whether ballots were

13   submitted for the August 11th, 2020, election without

14   voters' knowledge and, if so, who was filling out those

15   ballots.  The grand jury couldn't do its job properly

16   without truthful information from witnesses, including Muse

17   Mohamed, about where he got the three ballots that he

18   submitted by the agent delivery process.

19        You also know that Muse Mohamed's lies were

20   material to the grand jury because you heard pages and pages

21   of testimony of the grand jurors themselves questioning him

22   and pressing him for a truthful answer about where he got

23   these three ballots.  The grand jurors themselves wanted to

24   get this information from Muse Mohamed because it was

25   important to their investigation.

1          And, finally, you know that Muse Mohamed's false

2     testimony to the grand jury was material for one simple

3     reason.  Why would Muse Mohamed choose to lie about where he

4     got these ballots if he didn't know that this information

5     was important?  Why not just tell the grand jurors where he

6     really got the ballots?  The answer is obvious.  Muse

7     Mohamed didn't want the grand jurors to know where he really

8     got these ballots, and he didn't want the grand jurors'

9     investigation into who filled out the ballots to move

10    forward.

11          Muse Mohamed's false testimony was material, and

12    the fourth element is proven beyond a reasonable doubt.

13          Now, members of the jury, this case doesn't

14    involve a mistake or some kind of misunderstanding.  This is

15    not a situation where there was a "gotcha" moment where the

16    government picked out one little misstatement that Muse

17    Mohamed made during his grand jury testimony and charged him

18    with a crime.  Far from it.

19          This is a case about brazen lies that Muse Mohamed

20    told to the grand jury over and over and over again, lies

21    that go straight to the heart of the grand jury's

22    investigation.  When he was called to testify on

23    September 30th, 2021, Muse Mohamed lied and lied and lied,

24    but he wasn't charged with a crime for those lies.  He was

25    given a second chance to come in and tell the truth.  He was

1   placed under oath before the grand jury a second time; and

2   before he was asked any questions, the prosecutor reminded

3   him that if he were to lie to the grand jury, he could be

4   charged with a crime.  He chose to persist in his lies.

5           Because Muse Mohamed told those lies under oath to

6   the grand jury, that is a crime.  And for that reason, we

7   ask that you return the only verdict that is consistent with

8   the evidence in this case, a verdict of guilty on both

9   counts.

10          Thank you.

11          THE COURT:  Mr. Clippert, you may proceed.

12          MR. CLIPPERT:  I just need one second to, one

13  moment to get my computer running.

14          If it may please the court.  Counsel.  Members of

15  the jury.

16          Did Muse Mohamed lie or make false statements to

17  the grand jury, or did he just not tell the government what

18  they wanted to hear?  So I'm going to have a few comments

19  about some of the testimony that was presented and ask you

20  to consider the evidence and the law, and we can go from

21  there.

22          I think one of the most crucial witnesses in this

23  trial was Jon Martin.  He was the -- he's a guy with a

24  really great smile from the Hennepin County elections

25  office.  He testified about the process of this absentee

1    ballot.

2           One thing that was really important -- ooh, sorry

3    about that -- about this process is the security on the

4    ballots.  You can't get a ballot unless you have a social

5    security number or a driver's license.  And so those are

6    some examples of -- hold on.  So that's the three absentee

7    ballots, and you can see in each one of those there's a

8    field that requires someone to fill out that security

9    information.

10          So what's important is that these ballots -- and

11   he talked about this, and actually we talked about some of

12   the procedures in place about clawing back a ballot and

13   getting a ballot.  So these ballots aren't just like out.

14   You can't just go and get 12 ballots from the election

15   office.  You know, there's a process.  There's a way to

16   monitor the ballots, to do an audit.

17          And what's important here is none of the witnesses

18   who came in and testified about this absentee application

19   said, "My personal data was hacked.  Someone has my driver's

20   license.  Someone has my social security number.  I had a

21   problem with my credit.  My personal information has been

22   hacked."  None of them said that.  So somehow, if you're

23   going to believe the government, Mr. Mohamed was able to

24   conjure up, guess, randomize, somehow come up with this

25   confirming personal information to get -- to file these

1    ballots as like a fraudulent ballot.  And that's an

2    important point because, because the idea here is this --

3    the grand jury investigation was about an abusing this

4    absentee ballot process.  And so, again, the ballot security

5    here is a crucial issue that's here, and that's what Jon

6    Martin testified to and gave us.  So that was important

7    evidence, and I would suggest it's probably some of the most

8    important evidence in the trial.

9          I've got to comment on Mustafa Hassan, because

10   it's interesting that, again, if you are to believe him, and

11   that's your decision as to whether you are going to believe

12   him or not, that he's the-first-day volunteer in a campaign

13   and they're just going to give him, this stranger to the

14   campaign, bogus ballots to take to the ballot office.  That

15   doesn't make any sense that you are going to give someone

16   that you don't know, and you don't trust and you don't know

17   whether they're an informant or whether they're going to

18   come through with that, these ballots to take to the

19   campaign office.  And we know it's a big deal because this

20   investigation has been going on for a year, a grand jury

21   investigation involving the FBI.  So I think Mr. Hassan's

22   testimony just needs a closer look.

23         But importantly from Mr. Hassan, if you believe

24   that there was this backroom balloting transaction,

25   Mr. Mohamed was not there.  He was not part of it.  There's

1    nothing connecting him to that part of this process.

2          Ms. Nasro Jama was -- I mean, she was memorable,

3    and you didn't need a translator to understand a lot of what

4    she was saying.  There's some pretty universal body language

5    that was going on.  She doesn't want to be here or didn't

6    want to be here.  But, still, I think you need to look at

7    her testimony in light of all the evidence that's before the

8    court, including that her, her driver's license number was

9    validly on that absentee ballot.  Mr. Martin said some

10   people do forget when they vote absentee.  Did she forget to

11   vote absentee?  The system worked because her in-person

12   ballot counted.

13         And, briefly, the only testimony you heard today

14   was from Special Agent Blake Hostetter.  And we know from

15   his own testimony that he's part of the prosecution team.

16   That's why he gets to see these grand jury transcripts.

17         And one other question or one other consideration

18   for Mr. Martin's testimony is he's obviously going to come

19   in and testify that his office did their job right, right,

20   because it's the 2020 election.  It's one of the most

21   contentious elections in a long time.  So he's unlikely to

22   come in here and say, We screwed up, because just think of

23   all the holes that opens up in that process.

24         So the prosecutor and I are focusing in on some of

25   the elements of the offense, and I think we are focusing in

on because they're the appropriate thing here to look at.

So was Mr. Mohamed's testimony false in whole or in part?  What's important, there's a qualifier on that -- and, again, the judge is going to read you these instructions -- that you must unanimously agree on which statement is false.  So if three of you think one thing and nine of you think something else, that's not a unanimous verdict.  You must all agree on which part of that statement is false.

The statement must be material, meaning it must be capable of influencing the grand jury.  So I asked just a few questions about the scope of this grand jury investigation to see whether it was capable of influencing it.  It's been going on for a year.  80 witnesses or more.  80 I think is what the agent said.  So is a couple hours of testimony able -- is that going to influence the grand jury?

And then you are going to see these statements from Mr. Mohamed when you go back into the jury transcripts, through the grand jury transcripts, and what's important is he's consistent through this whole process.

So, and this is the first page of Exhibit 1, and you will see that, as he testifies, he talks about his general duties.  I'm a campaign volunteer; I was mostly door knocking; that's generally what I was doing.  Well, the government wasn't liking his explanation about what he was

1    doing about the agent ballot delivery, and you will see -- I

2    just have one example in here that -- and actually this is

3    what the government talked about as well.  This isn't a

4    four-year-old confronting Mr. Mohamed.  This is a

5    United States Assistant Prosecutor, an AUSA you call them, a

6    United States Assistant Attorney.  This isn't some bum off

7    the street.  This is someone that's got the force of the

8    United States Government behind them.  And they are

9    confronting Mr. Mohamed with a statement, and he's

10   consistent.  He's consistent through this whole process that

11   the ballots were delivered through this agent delivery

12   process.

13          The other last comment on a witness is mister --

14   I'm terrible with my handwriting.  I'm sorry.  Abdiriman

15   Muse.  Here's what we know.  We know the address is wrong on

16   the absentee ballot application; we know the apartment

17   number is wrong; we know the phone number is wrong.  So

18   that -- I think that absentee ballot just isn't worth, you

19   know, the weight of the testimony, any weight or testimonial

20   value.  Because is he the right person?  We don't even know

21   that because of the misspellings of the name, the apartment

22   number and the address.  Maybe someone should have gone to

23   the right apartment number, knocked and said, hey, is this,

24   you know, is this you.  But we didn't hear that they had

25   checked that out.

1          So I want to talk just real quickly about this

2     burden of proof, presumption of innocence and what that

3     really means.  The judge is going to instruct you on that.

4     It means that the defense doesn't have to offer any

5     evidence.  It's the government's burden solely to prove

6     these cases beyond a reasonable doubt.

7          And reasonable doubt.  The judge is going to give

8     you an instruction, but I want you to think about it.  It's

9     your most important life decisions.  People get married, but

10    people can get divorced.  People buy houses; you can sell a

11    house.  So this is a decision that's greater, of greater

12    importance than those.

13         And proof beyond a reasonable doubt.  One way to

14    think about it is like a continuum.  So like say to the

15    judge is actual innocence, say to this podium is actual

16    metaphysical guilt.  And then you draw that line of proof

17    beyond a reasonable doubt.  That's your comfort level in

18    those life decisions.  And the government's got to prove

19    these essential elements beyond that reasonable doubt.  So

20    if you're, if you're here (indicating), that's your own

21    line, and they come up short on any element, your verdict

22    has to be not guilty.  And that's what I'm going to be

23    asking you to do, is return not guilty verdicts on both

24    counts.

25         Thank you.

1          THE COURT:  Ms. Svendsen, rebuttal.

2          MS. SVENDSEN:  Thank you, Your Honor.

3          I agree with defense counsel about one thing;

4     Mr. Mohamed was consistent.  He consistently lied to the

5     grand jury over and over.  He did that on September 30th,

6     2021.  He did it on October 14th, 2021.

7          If you listen carefully to the instructions that

8     Judge Brasel is about to give you, you will hear that you're

9     allowed to use your common sense when you're evaluating the

10    evidence in this case.  And if you do that, you're going to

11    return the only verdict that the evidence in this case

12    demands, that Mr. Mohamed is guilty of both counts with

13    which he's charged in the indictment.

14         Now, two issues that you've heard about relate to

15    the credibility of the witnesses that you heard from on the

16    stand and whether or not Mr. Mohamed's testimony was

17    material to the grand jury's investigation.

18         Starting with that second one, defense counsel

19    asked you whether a couple hours of false testimony really

20    could have impacted the grand jury's investigation in this

21    case.  The answer is absolutely yes.  If Mr. Mohamed had

22    told the grand jury the truth about where he got these

23    ballots from, it certainly would have impacted the grand

24    jury's investigation.  That's why you heard them asking him

25    question after question after question.  Should we charge

1   these witnesses with perjury?  Are they lying?  Why don't

2   you take a second and decide which path you are going to go

3   down?  Choose to take the right path and tell the truth, but

4   he didn't do that.

5           Now, you heard from a series of witnesses on the

6   stand, witnesses that don't know each other, Nasro Jama,

7   Mustafa Hassan, Abdiriman Muse, and they all told you the

8   same thing.  Muse Mohamed didn't go to their houses, didn't

9   give them ballots, didn't collect their ballots.

10          In fact, Mr. Clippert asked you to believe that

11  maybe there's a different Abdiriman Muse whose name maybe

12  has an A-H or an A in it who lives, you know, on the floor

13  below in his same apartment building.  But if you remember,

14  Mr. Muse told you that in spite of the fact that a different

15  social security number had initially been filled in there

16  and crossed out, those were his last four digits and that

17  was his mom's phone number.

18          So use your common sense.  Is it likely that

19  there's another guy living on the floor below with his mom's

20  phone number, his same four digits and his, his name the

21  same, but for a couple of letters in his first name?  Or

22  does your common sense tell you that Muse Mohamed turned in

23  applications for a ballot for a voter who didn't ask for

24  one?

25          In this case, this is not a case about Muse

1    Mohamed not telling the government what they wanted to hear.

2    You heard Special Agent Hostetter testify about that the

3    grand jury was just trying to find out what happened in this

4    case.  And you saw that Muse Mohamed was told to tell the

5    truth.  That was the only information he was given.  He

6    wasn't given any information about what the government

7    wanted to hear.  He was told that his obligation was to tell

8    the truth.  That's the oath that he took.  He violated that

9    oath, and he lied to the grand jury over and over.  And for

10   that reason, you should find him guilty.

11          THE COURT:  Thank you, counsel.

12          Members of the jury, the instructions that I gave

13   you at the beginning of the trial and during the trial

14   remain in effect.  I now give you some additional

15   instructions.

16          You must, of course, continue to follow the

17   instructions I gave you earlier, as well as those I give you

18   now.  You must not single out some instructions and ignore

19   others, because all are important.  This is true even though

20   some of those I gave you at the beginning of and during

21   trial are not repeated here.

22          The instructions I'm about to give you are in

23   writing.  They will be available to you in the jury room.  I

24   emphasize, however, that this does not mean they are more

25   important than any earlier instructions.  Again, all

1    instructions, whenever given and whether in writing or not,

2    must be followed.

3         It is your duty to find from the evidence what the

4    facts are.  You will then apply the law, as I give it to

5    you, to those facts.  You must follow my instructions on the

6    law, even if you thought the law was different or should be

7    different.

8         You should not be influenced by any person's race,

9    color, ethnicity, national origin, religion, gender, gender

10   identity, sexual orientation, disability, or economic

11   circumstances.  You must decide the case solely on the

12   evidence and the law before you and must not be influenced

13   by any personal likes or dislikes, opinions, prejudices,

14   sympathy or biases, including unconscious bias.  Unconscious

15   biases are stereotypes, attitudes, or preferences that

16   people may consciously reject, but may express without

17   conscious awareness, control or intention.  Like conscious

18   bias, unconscious bias too can affect how we evaluate

19   information and make decisions.  The law demands of you a

20   just verdict, unaffected by anything except the evidence,

21   your common sense and the law as I give it to you.

22        I have mentioned the word "evidence."  The

23   evidence in this case consists of the testimony of

24   witnesses, the documents and other things received as

25   exhibits and the facts that have been stipulated, that is,

1    formally agreed to by the parties.

2          You may use reason and common sense to draw

3    deductions or conclusions from facts which have been

4    established by the evidence in the case.

5          Certain things are not evidence.  I shall list

6    those again for you now.

7          One, statements, arguments, questions and comments

8    by lawyers representing the parties in the case are not

9    evidence.

10         Two, objections are not evidence.  Lawyers have a

11   right to object when they believe something is improper.

12   You should not be influenced by that objection.  If I

13   sustained an objection to a question, you must ignore the

14   question and must not try to guess at what the answer might

15   have been.

16         Three, testimony that I struck from the record or

17   told you to disregard is not evidence and must not be

18   considered.

19         Four, anything you saw or heard about this case

20   outside the courtroom is not evidence.

21         And, finally, if you were instructed that some

22   evidence was received for a limited purpose only, you must

23   follow that instruction.

24         In deciding what the facts are, you may have to

25   decide what testimony you believe and what testimony you do

1  not believe.  You may believe all of what a witness said or

2  only part of it or none of it.

3       In deciding what testimony to believe, consider

4  the witness's intelligence, the opportunity the witness had

5  to have seen or heard the things testified about, the

6  witness's memory, any motives that witness may have for

7  testifying a certain way, the manner of the witness while

8  testifying, whether the witness said something different at

9  an earlier time, the general reasonableness of the

10  testimony, and the extent to which the testimony is

11  consistent with any evidence that you believe.

12       In deciding whether or not to believe a witness,

13  keep in mind that people sometimes hear or see things

14  differently and sometimes forget things.  You need to

15  consider therefore whether a contradiction is an innocent

16  misrecollection or a lapse of memory or an intentional

17  falsehood, and that may depend on whether it has to do with

18  an important fact or only a small detail.

19       The indictment in this case charges Muse Mohamud

20  Mohamed with two counts of making a false declaration before

21  a grand jury.  Mr. Mohamed has pleaded not guilty to each of

22  those charges.

23       The indictment is simply a document that formally

24  charges Mr. Mohamed with the crimes for which he is on

25  trial.  The indictment is not evidence.  At the beginning of

1    the trial I instructed you that you must presume Mr. Mohamed

2    to be innocent.  Thus, Mr. Mohamed began the trial with a

3    clean slate with no evidence against him.

4         The presumption of innocence alone is sufficient

5    to find Mr. Mohamed not guilty and can be overcome only if

6    the government proved during the trial, beyond a reasonable

7    doubt, each element of the crime charged.

8         Keep in mind that each count charges a separate

9    crime.  You must consider each count separately and return a

10   separate verdict for each count.

11        There is no burden upon Mr. Mohamed to prove that

12   he is innocent.  Instead, the burden of proof remains with

13   the government throughout the trial.  The fact that

14   Mr. Mohamed did not testify must not be considered by you in

15   any way or even discussed in arriving at your verdicts.

16        The crime of making a false declaration before a

17   grand jury, as charged in Count 1 of the indictment, has

18   four elements, which are:

19        One, the defendant testified under oath or

20   affirmation before a grand jury that "I got three absentee

21   ballots from the elections office.  I took -- I took those

22   ballots to the voters, they filled them out, they voted, and

23   then I took them back and turned those -- I turned those

24   absentee ballots back to the election office";

25        Two, such testimony was false in whole or in part;

1           Three, at the time he so testified, the defendant

2    knew his testimony was false; and

3           Four, the false testimony was material.

4           False testimony is "material" if the testimony was

5    capable of influencing the grand jury.  It is not necessary

6    that the false testimony actually affected the grand jury.

7           You need not find that all of the alleged false

8    statements in each count of the indictment are false;

9    instead, you must find unanimously and beyond a reasonable

10    doubt that at least one of the statements set out in a

11    particular count of the indictment is false.

12           If all of these elements have been proved beyond a

13    reasonable doubt as to Mr. Mohamed, then you must find

14    Mr. Mohamed guilty of the crime charged under Count 1;

15    otherwise, you must find Mr. Mohamed not guilty of this

16    crime under Count 1.

17           The crime of making a false declaration before a

18    grand jury, as charged in Count 2 of the indictment, also

19    has four elements, which are:

20           One, the defendant testified under oath or

21    affirmation before a grand jury that "I got the absentee

22    ballot from the elections office and took it to Nasro Jama"

23    and "I remember Nasro Jama was the one who filled out the

24    absentee ballots -- or the absentee ballot, sealed it up,

25    and then told me to drop it off for her";

1            Two, such testimony was false in whole or in part;

2            Three, at the time he so testified, the defendant

3    knew his testimony was false; and

4            Four, the false testimony was material.

5            False testimony is "material" if the testimony was

6    capable of influencing the grand jury.  It is not necessary

7    for you to find that false testimony actually affected the

8    grand jury.

9            You need not find that all of the alleged false

10   statements in each of the indictment are false; instead, you

11   must find unanimously and beyond a reasonable doubt that at

12   least one of the statements set out in a particular count of

13   the indictment is false.

14           If all of these elements have been proved beyond a

15   reasonable doubt as to Mr. Mohamed, then you must find

16   Mr. Mohamed guilty of the crime charged under Count 2;

17   otherwise, you must find Mr. Mohamed not guilty of this

18   crime under Count 2.

19           Reasonable doubt is doubt based upon reason and

20   common sense and not doubt based on speculation.  A

21   reasonable doubt may arise from careful and impartial

22   consideration of all the evidence or from a lack of

23   evidence.  Proof beyond a reasonable doubt is proof of such

24   convincing character that a reasonable person, after careful

25   consideration, would not hesitate to rely and act upon that

1    proof in life's most important decisions.  Proof beyond a

2    reasonable doubt is proof that leaves you firmly convinced

3    of Mr. Mohamed's guilt.  Proof beyond a reasonable doubt

4    does not mean proof beyond all possible doubt.

5         Intent or knowledge may be proved like anything

6    else.  You may consider any statements made and acts done by

7    Mr. Mohamed and all the facts and circumstances in evidence

8    which may aid in a determination of Mr. Mohamed's knowledge

9    or intent.

10        You may, but are not required to, infer that a

11   person intends the natural and probable consequences of acts

12   knowingly done or knowingly omitted.

13        As to venue, the government must prove that it is

14   more likely than not -- or more likely true than not true

15   that the offense charged was begun, continued or completed

16   in the District of Minnesota.  You decide these facts by

17   considering all of the evidence and deciding what evidence

18   is more believable.  This is a lower standard of proof than

19   beyond a reasonable doubt.  The requirement of proof beyond

20   a reasonable doubt applies to all other issues in the case.

21        As to the date of the crime charged, the

22   indictment charges that the offenses were committed on or

23   about October 14th, 2021.  The government must prove that

24   the offenses happened reasonably close to that date, but it

25   is not required to prove the alleged offenses happened on

1    that exact date.

2          In conducting your deliberations and returning

3    your verdict, there are certain rules that you must follow.

4    And I'm going to list those for you now.

5          First, when you go to the jury room, you must

6    elect one of your members -- sorry -- select one of your

7    members as your foreperson.  That person will preside over

8    your discussions and speak for you here in court.

9          Second, it is your duty as jurors to discuss this

10   case with one another in the jury room.  You should try to

11   reach agreement if you can do so without violence to

12   individual judgment, because a verdict, whether guilty or

13   not guilty, must be unanimous.

14         Each of you must make your own conscientious

15   decision, but only after you have considered all the

16   evidence, discussed it fully with your fellow jurors, and

17   listened to the views of your fellow jurors.

18         Do not be afraid to change your opinions if the

19   discussion persuades you that you should.  But do not come

20   to a decision simply because other jurors think it is right

21   or simply to reach a verdict.

22         Third, if Mr. Mohamed is found guilty, the

23   sentence to be imposed is my responsibility.  You may not

24   consider punishment in any way in deciding whether the

25   government has proved its case beyond a reasonable doubt.

1          Fourth, if you need to communicate with me during

2     your deliberations, you may send a note to me through the

3     court security officer, signed by one or more jurors.  I

4     will respond as soon as possible either in writing or orally

5     here in open court.  Remember that you should not tell

6     anyone, including me, how your votes stand numerically.

7          Fifth, your verdict must be based solely on the

8     evidence and the law which I have given you in my

9     instructions.  The verdict, whether guilty or not guilty,

10    must be unanimous.  Nothing I have said or done is intended

11    to suggest what your verdict should be.  That is entirely

12    for you to decide.

13         Finally, the verdict form in this case is simply

14    the written notice of the decision that you reach.

15         The form reads, as to Count 1, False Declaration

16    Before a Grand Jury, We, the jury, unanimously find the

17    defendant Muse Mohamud Mohamed, and then there's a check

18    mark for either guilty or not guilty, of the crime of making

19    a false declaration before a grand jury, as charged in

20    Count 1 of the indictment.

21         And the second page reads, Count 2, False

22    Declaration Before a Grand Jury, We, the jury, unanimously

23    find the defendant Muse Mohamud Mohamed, and then there's a

24    check mark for either guilty or not guilty, of the crime of

25    making a false declaration before a grand jury, as charged

1    in Count 2 of the indictment.

2              And then there is a place for the foreperson to

3    sign and date the form.

4              You will take this form to the jury room.  When

5    each of you has agreed on the verdicts, your foreperson will

6    fill out the forms, sign and date them, and advise the court

7    security officer that you are ready to return to the

8    courtroom.

9              That concludes my instructions.  Other than as

10   previously noted on the record, are there any objections,

11   additions or corrections from the government?

12             MS. MUNOZ:  No, Your Honor.  Thank you.

13             THE COURT:  And from the defense?

14             MR. CLIPPERT:  No, Your Honor.

15             THE COURT:  The courtroom deputy, Ms. Wegner, is

16   going to work with the lawyers to gather all of the exhibits

17   to you so that we get them to you quickly in the jury room.

18             This is my least favorite part of a trial.  I must

19   excuse the alternate jurors now from serving as a

20   deliberating juror on the case.  I'd like you both to leave

21   the courtroom, go to the jury room, gather your belongings.

22             I don't know whether this will be good news or bad

23   news for you, but I do want you to know that serving as an

24   alternate is equal to serving as a juror in this case.  You

25   have fulfilled your commitment as a citizen.  You have

1   fulfilled your commitment to the Constitution, and you have

2   the appreciation of the court and the parties.

3          Ms. Gilbertson and Mr. Mickelson, you are the

4   alternates in this case.  So I'll excuse you now.  If you'd

5   wait for just a few minutes, I will come back and greet you,

6   when you are back in the jury room, but I'm going to excuse

7   you now.

8          (Alternate jurors exit the courtroom)

9          THE COURT:  Would the court security officer

10  please come forward to be sworn?

11         COURTROOM DEPUTY:  Please raise your right hand.

12                (Oath administered)

13         COURT SECURITY OFFICER:  I do.

14         COURTROOM DEPUTY:  Thank you.

15         THE COURT:  Members of the jury, you will have

16  access to your notes, the instructions that I've given you

17  and the verdict form.  That includes -- the instructions

18  include the essential elements that must be proven.  You

19  will also have access, as soon as we can get them to you, to

20  the exhibits that were admitted into evidence.

21         So I will now instruct you to go to the jury room

22  and deliberate.  Good luck to you.  The case is submitted.

23         All rise.

24  2:00 p.m.

25

1    **IN OPEN COURT**

2    **(JURY NOT PRESENT)**

3        THE COURT:  You may all be seated.

4        Counsel, if there are questions from the jury,

5    please make sure that Ms. Wegner knows how to reach you.  I

6    will propose an answer and get back to you with that answer,

7    and we can discuss it.  I'll probably hold a telephone

8    conference to do that.  That can either be on the record or

9    not, depending on the circumstances.

10        I want to express my appreciation to you.  You

11   have tried this case civilly and with cooperation with each

12   other, and that has been beneficial to the process and to

13   the court and to both parties.  So I thank you for that.

14        Is there anything that needs to come before the

15   court before I leave you to gathering the exhibits for the

16   jurors?  From the government, Ms. Munoz?

17        MS. MUNOZ:  Thank you, Your Honor.

18        With respect to the exhibits, we've provided a

19   binder with one copy of everything, 1 through 24.  We also

20   have extra copies -- we brought 12 extra copies of

21   Exhibits 1 through 4, which are the transcripts.  Being

22   mindful that we are still in this pandemic, we brought

23   extra.  So we have them here and are able to send them back

24   with the jury.

25        THE COURT:  Thank you.

1          Is there any objection to that process,

2     Mr. Clippert?

3          MR. CLIPPERT:  Initially I was going to say yes,

4     but actually, as I spell it out, I think it makes sense,

5     because that way we don't have one person kind of in control

6     of the notebook with the exhibits.  So I think that makes

7     sense, Your Honor.

8          THE COURT:  Normally I wouldn't allow multiple

9     copies of a particular exhibit to go back, but here --

10    because it would maybe unnecessarily emphasize that piece of

11    evidence.  Here it's very clear what the critical piece of

12    evidence or it is, because the transcripts are the record of

13    what the defendant said in front of the grand jury, which is

14    central to the case, and I think that's an obvious precept

15    and accepted by everyone.  So I will allow that process.

16    And I thank you.

17         I think it's also helpful to COVID protocol and

18    separation of the jurors, to the extent that they can be

19    separated back in the jury room.  So thank you.

20         Anything further from the government then?

21         MS. MUNOZ:  No, Your Honor.  Thank you.

22         THE COURT:  Thank you.

23         Mr. Clippert, anything from you, sir?

24         MR. CLIPPERT:  Nothing further, Your Honor.

25         THE COURT:  All right.  And so make sure that

1    you're -- that you stay close.

2          The jurors, just so you know, I had indicated that

3    they were free to go at four today, because the court had an

4    obligation.  I had not anticipated ending so quickly.  And,

5    therefore, I think they've asked if they can deliberate till

6    five.  And I will allow them to do that.  So please stay

7    close until five.  I can hop out of my commitment should a

8    verdict come at that time.

9          Thank you, everyone.

10          COURTROOM DEPUTY:  All rise.

11          (Recess taken at 2:04 p.m. till 2:57 p.m.)

12                    **IN OPEN COURT**

13                    **(JURY PRESENT)**

14          THE COURT:  You may all be seated.

15          We are on the record in the presence of the jury.

16          Members of the jury, I've been informed that you

17    have reached a unanimous verdict; is that correct?

18          FOREPERSON:  We have.

19          THE COURT:  And is it Legare?

20          FOREPERSON:  Yes.

21          THE COURT:  Mr. Legare, you have been chosen to be

22    the foreperson of the jury?

23          FOREPERSONN:  That is correct.

24          THE COURT:  Would you hand the jury verdict up to

25    the court?  I'll have the court security officer come and

1   hand it to me.

2         Thank you.

3         I will take this form and make sure that it is

4   regular in form and unqualified.

5         Members of the jury, I'm going to now publish the

6   verdict, which simply means that I'm going to read it aloud.

7   I want you to listen carefully.  After it is published, I'm

8   going to poll each of you individually and ask you if these

9   are your true and correct verdicts.

10        The verdict form reads as follows:

11        Count 1, False Declaration Before A Grand Jury.

12  We, the jury, unanimously find the defendant Muse Mohamud

13  Mohamed guilty of the crime of making a false declaration

14  before a grand jury, as charged in Count 1 of the

15  indictment.

16        Count 2, False Declaration Before The Grand Jury.

17  We, the jury, unanimously find the defendant Muse Mohamud

18  Mohamed guilty of the crime of making a false declaration

19  before a grand jury, as charged in Count 2 of the

20  indictment.

21        And it is signed and dated by the foreperson.

22        I'm now going to poll each of you.

23        Ms. Siems, are these your true and correct

24  verdicts?

25        JUROR:  Yes.

1      THE COURT:  Ms. Becker, are these your true and

2  correct verdicts?

3      JUROR:  Yes, Your Honor.

4      THE COURT:  Ms. Craig, are these your true and

5  correct verdicts?

6      JUROR:  Yes.

7      THE COURT:  Ms. Jones, are these your true and

8  correct verdicts?

9      JUROR:  Yes.

10      THE COURT:  Ms. Juanita Flores Soria, are these

11  your true and correct verdicts?

12      JUROR:  Yes, Your Honor.

13      THE COURT:  Ms. Fasbender, are these your true and

14  correct verdicts?

15      JUROR:  Yes, Your Honor.

16      THE COURT:  Mr. Molde, are these your true and

17  correct verdicts?

18      JUROR:  Yeah.

19      THE COURT:  Ms. Burstrand, are these your true and

20  correct verdicts?

21      JUROR:  Yes.

22      THE COURT:  Ms. Stroos, are these your true and

23  correct verdicts?

24      JUROR:  Yes, Your Honor.

25      THE COURT:  Ms. Peters, are these your true and

```
 1   correct verdicts?

 2              JUROR:  Yes.

 3              THE COURT:  Ms. Friederich, are these your true

 4   and correct verdicts?

 5              JUROR:  Yes.

 6              THE COURT:  Mr. Legare, are these your true and

 7   correct verdicts?

 8              JUROR:  Yes.

 9              THE COURT:  I'm going to order that the verdicts

10   be filed.

11              I want to say to the jurors thank you for your

12   service.  Every time that I go through this process and talk

13   to a jury I am always so impressed with the work that the

14   jury does.  And I have to tell you that every single time I

15   do it I get chills, because you have fulfilled our

16   constitutional obligation and our constitutional rights and

17   responsibilities, and it's an enormous right and

18   responsibility of citizenship that you fulfilled.  So thank

19   you.  You go with the thanks of the court and the thanks of

20   the parties.

21              I'm going to ask you to go back to the jury room.

22   If you wait just a few minutes, I'd like to come back and

23   thank you personally.

24              All rise for the jury.

25   3:01 p.m.
```

1    **IN OPEN COURT**

2    **(JURY NOT PRESENT)**

3          THE COURT:  The court will enter judgment on each

4    count of the indictment, Counts 1 and 2, a judgment of

5    guilty.

6          Mr. Mohamed, here is what happens next.  You will

7    be interviewed by probation for a presentence report; and

8    after that presentence report is prepared, we will set a

9    sentencing date.

10          I need to tell you that it is a separate crime for

11    you not to appear at sentencing.  Do you understand that,

12    sir?

13          THE DEFENDANT (through interpreter):  Yes.

14          THE COURT:  Does the government have a position as

15    to whether the defendant should remain on bond pending

16    sentencing?  Ms. Munoz?

17          MS. MUNOZ:  No, Your Honor.  We defer to the

18    court.

19          THE COURT:  Is probation here?  You are here.  Are

20    there any changes to your release report since the time that

21    you gave it to me at the beginning of trial?

22          PROBATION OFFICER:  Your Honor, I'm not the author

23    of the pretrial report, but there have been no changes.

24          THE COURT:  No changes, yes.  Thank you so much.

25          So I'm going to allow you to continue to be

released on bond under the same conditions as before.
That's what's recommended by probation.  It's really
important that you continue to follow the conditions of
release upon which you were released.  Do you understand
that?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Clippert, anything from you, sir?

MR. CLIPPERT:  Nothing further, Your Honor.

THE COURT:  Anything from the government?

MS. MUNOZ:  No, Your Honor.  Thank you.

THE COURT:  Again, I'd like to thank you all for a
well-tried case.  And I'll set a sentencing date after the
presentence report is prepared and after the parties have
made their objections and any sentencing position papers.

Again, Mr. Mohamed, it's important that you abide
by the conditions of your release and that you appear for
sentencing.

All right.  Thank you, everyone.

COURTROOM DEPUTY:  All rise.  Court is in recess.

(Court adjourned at 3:03 p.m., 05-10-2022.)

*  *  *

I, Renee A. Rogge, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter.

Certified by:  /s/Renee A. Rogge
Renee A. Rogge, RMR-CRR